# CTS CORP. *v.* DYNAMICS CORPORATION OF AMERICA

No. 86–71.   Argued March 2, 1987—Decided April 21, 1987*

---

*Together with No. 86–97, *Indiana* v. *Dynamics Corporation of America,* also on appeal from the same court.

70

Powell, J., delivered the opinion of the Court, in which Rehnquist, C. J., and Brennan, Marshall, and O'Connor, JJ., joined, and in Parts I, III–A, and III–B of which Scalia, J., joined. Scalia, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 94. White, J., filed a dissenting opinion, in Part II of which Blackmun and Stevens, JJ., joined, *post*, p. 97.

*James A. Strain* argued the cause for appellant in No. 86–71. With him on the brief were *Richard E. Deer* and *Stanley C. Fickle*. *John F. Pritchard* argued the cause and filed a brief for appellant in No. 86–97.

*Lowell E. Sachnoff* argued the cause for appellee in both cases. With him on the brief were *Dean A. Dickie* and *Sarah R. Wolff.*†

JUSTICE POWELL delivered the opinion of the Court.

These cases present the questions whether the Control Share Acquisitions Chapter of the Indiana Business Corporation Law, Ind. Code § 23–1–42–1 *et seq.* (Supp. 1986), is pre-empted by the Williams Act, 82 Stat. 454, as amended, 15 U. S. C. §§ 78m(d)–(e) and 78n(d)–(f) (1982 ed. and Supp. III), or violates the Commerce Clause of the Federal Constitution, Art. I, § 8, cl. 3.

## I

### A

On March 4, 1986, the Governor of Indiana signed a revised Indiana Business Corporation Law, Ind. Code § 23–1–17–1 *et seq.* (Supp. 1986). That law included the Control Share Acquisitions Chapter (Indiana Act or Act). Beginning on August 1, 1987, the Act will apply to any corporation incorporated in Indiana, § 23–1–17–3(a), unless the corporation amends its articles of incorporation or bylaws to opt out of the Act, § 23–1–42–5. Before that date, any Indiana corporation can opt into the Act by resolution of its board of directors. § 23–1–17–3(b). The Act applies only to "issuing

---

†Briefs of *amici curiae* urging reversal were filed for the State of New York by *Robert Abrams*, Attorney General, *O. Peter Sherwood*, Solicitor General, *Mary Ellen Burns*, Deputy Chief Assistant Attorney General, and *Colvin W. Grannum*, Assistant Attorney General; for the State of Minnesota by *Hubert H. Humphrey III*, Attorney General, and *Alan I. Gilbert* and *Barry R. Greller*, Special Assistant Attorneys General; and for the Indiana Chamber of Commerce et al. by *Donald F. Elliott, Jr.*, and *Barton R. Peterson.*

Briefs of *amici curiae* urging affirmance were filed for the Securities and Exchange Commission et al. by *Solicitor General Fried, Deputy Solicitor General Cohen, Roy T. Englert, Jr., Daniel L. Goelzer,* and *Paul Gonson;* for the Securities Industry Association, Inc., by *Marc P. Cherno, Irwin Blum,* and *William J. Fitzpatrick;* and for the United Shareholders Association by *James Edward Maloney* and *David E. Warden.*

public corporations." The term "corporation" includes only businesses incorporated in Indiana. See § 23–1–20–5. An "issuing public corporation" is defined as:

"a corporation that has:
"(1) one hundred (100) or more shareholders;
"(2) its principal place of business, its principal office, or substantial assets within Indiana; and
"(3) either:
"(A) more than ten percent (10%) of its shareholders resident in Indiana;
"(B) more than ten percent (10%) of its shares owned by Indiana residents; or
"(C) ten thousand (10,000) shareholders resident in Indiana." § 23–1–42–4(a).[1]

The Act focuses on the acquisition of "control shares" in an issuing public corporation. Under the Act, an entity acquires "control shares" whenever it acquires shares that, but for the operation of the Act, would bring its voting power in the corporation to or above any of three thresholds: 20%, 33⅓%, or 50%. § 23–1–42–1. An entity that acquires control shares does not necessarily acquire voting rights. Rather, it gains those rights only "to the extent granted by resolution approved by the shareholders of the issuing public corporation." § 23–1–42–9(a). Section 23–1–42–9(b) requires a majority vote of all disinterested[2] shareholders holding each

---

[1] These thresholds are much higher than the 5% threshold acquisition requirement that brings a tender offer under the coverage of the Williams Act. See 15 U. S. C. § 78n(d)(1).

[2] "Interested shares" are shares with respect to which the acquiror, an officer, or an inside director of the corporation "may exercise or direct the exercise of the voting power of the corporation in the election of directors." § 23–1–42–3. If the record date passes before the acquiror purchases shares pursuant to the tender offer, the purchased shares will not be "interested shares" within the meaning of the Act; although the acquiror may own the shares on the date of the meeting, it will not "exercise . . . the voting power" of the shares.

As a practical matter, the record date usually will pass before shares change hands. Under Securities and Exchange Commission (SEC) regu-

class of stock for passage of such a resolution. The practical effect of this requirement is to condition acquisition of control of a corporation on approval of a majority of the pre-existing disinterested shareholders.[3]

The shareholders decide whether to confer rights on the control shares at the next regularly scheduled meeting of the shareholders, or at a specially scheduled meeting. The

---

lations, the shares cannot be purchased until 20 business days after the offer commences. 17 CFR § 240.14e–1(a) (1986). If the acquiror seeks an early resolution of the issue—as most acquirors will—the meeting required by the Act must be held no more than 50 calendar days after the offer commences, about three weeks after the earliest date on which the shares could be purchased. See § 23–1–42–7. The Act requires management to give notice of the meeting "as promptly as reasonably practicable . . . to all shareholders of record as of the record date set for the meeting." § 23–1–42–8(a). It seems likely that management of the target corporation would violate this obligation if it delayed setting the record date and sending notice until after 20 business days had passed. Thus, we assume that the record date usually will be set before the date on which federal law first permits purchase of the shares.

[3] The United States and appellee Dynamics Corporation suggest that § 23–1–42–9(b)(1) requires a second vote by *all* shareholders of record. Brief for SEC and United States as *Amici Curiae* 5, and n. 6; Brief for Appellee 2–3, and n. 5. Indiana disputes this interpretation of its Act. Brief for Appellant in No. 86–87, p. 29, n. Section 23–1–42–9(b)(1) provides:

"[T]he resolution must be approved by:

"(1) each voting group entitled to vote separately on the proposal by a majority of all the votes entitled to be cast by that voting group, with the holders of the outstanding shares of a class being entitled to vote as a separate voting group if the proposed control share acquisition would, if fully carried out, result in any of the changes described in [Indiana Code § 23–1–38–4(a) (describing fundamental changes in corporate organization)]."

The United States contends that this section always requires a separate vote by all shareholders and that the last clause merely specifies that the vote shall be taken by separate groups if the acquisition would result in one of the listed transactions. Indiana argues that this section requires a separate vote only if the acquisition would result in one of the listed transactions. Because it is unnecessary to our decision, we express no opinion as to the appropriate interpretation of this section.

acquiror can require management of the corporation to hold such a special meeting within 50 days if it files an "acquiring person statement,"[4] requests the meeting, and agrees to pay the expenses of the meeting. See § 23–1–42–7. If the shareholders do not vote to restore voting rights to the shares, the corporation may redeem the control shares from the acquiror at fair market value, but it is not required to do so. § 23–1–42–10(b). Similarly, if the acquiror does not file an acquiring person statement with the corporation, the corporation may, if its bylaws or articles of incorporation so provide, redeem the shares at any time after 60 days after the acquiror's last acquisition. § 23–1–42–10(a).

## B

On March 10, 1986, appellee Dynamics Corporation of America (Dynamics) owned 9.6% of the common stock of appellant CTS Corporation, an Indiana corporation. On that day, six days after the Act went into effect, Dynamics announced a tender offer for another million shares in CTS; purchase of those shares would have brought Dynamics' ownership interest in CTS to 27.5%. Also on March 10, Dynamics filed suit in the United States District Court for the Northern District of Illinois, alleging that CTS had violated the federal securities laws in a number of respects no longer relevant to these proceedings. On March 27, the board of directors of CTS, an Indiana corporation, elected to be governed by the provisions of the Act, see § 23–1–17–3.

Four days later, on March 31, Dynamics moved for leave to amend its complaint to allege that the Act is pre-empted by the Williams Act, 15 U. S. C. §§ 78m(d)–(e) and 78n(d)–(f) (1982 ed. and Supp. III), and violates the Commerce Clause, Art. I, § 8, cl. 3. Dynamics sought a temporary restraining order, a preliminary injunction, and declaratory relief against

---

[4] An "acquiring person statement" is an information statement describing, *inter alia*, the identity of the acquiring person and the terms and extent of the proposed acquisition. See § 23–1–42–6.

CTS' use of the Act. On April 9, the District Court ruled that the Williams Act pre-empts the Indiana Act and granted Dynamics' motion for declaratory relief. 637 F. Supp. 389 (ND Ill. 1986). Relying on JUSTICE WHITE's plurality opinion in *Edgar* v. *MITE Corp.*, 457 U. S. 624 (1982), the court concluded that the Act "wholly frustrates the purpose and objective of Congress in striking a balance between the investor, management, and the takeover bidder in takeover contests." 637 F. Supp., at 399. A week later, on April 17, the District Court issued an opinion accepting Dynamics' claim that the Act violates the Commerce Clause. This holding rested on the court's conclusion that "the substantial interference with interstate commerce created by the [Act] outweighs the articulated local benefits so as to create an impermissible indirect burden on interstate commerce." *Id.*, at 406. The District Court certified its decisions on the Williams Act and Commerce Clause claims as final under Federal Rule of Civil Procedure 54(b). *Ibid.*

CTS appealed the District Court's holdings on these claims to the Court of Appeals for the Seventh Circuit. Because of the imminence of CTS' annual meeting, the Court of Appeals consolidated and expedited the two appeals. On April 23— 23 days after Dynamics first contested application of the Act in the District Court—the Court of Appeals issued an order affirming the judgment of the District Court. The opinion followed on May 28. 794 F. 2d 250 (1986).

After disposing of a variety of questions not relevant to this appeal, the Court of Appeals examined Dynamics' claim that the Williams Act pre-empts the Indiana Act. The court looked first to the plurality opinion in *Edgar* v. *MITE Corp.*, *supra*, in which three Justices found that the Williams Act pre-empts state statutes that upset the balance between target management and a tender offeror. The court noted that some commentators had disputed this view of the Williams Act, concluding instead that the Williams Act was "an anti-takeover statute, expressing a view, however benighted,

that hostile takeovers are bad." 794 F. 2d, at 262. It also noted:

> "[I]t is a big leap from saying that the Williams Act does not itself exhibit much hostility to tender offers to saying that it implicitly forbids states to adopt more hostile regulations. . . . But whatever doubts of the Williams' Act preemptive intent we might entertain as an original matter are stilled by the weight of precedent." *Ibid.*

Once the court had decided to apply the analysis of the *MITE* plurality, it found the case straightforward:

> "Very few tender offers could run the gauntlet that Indiana has set up. In any event, if the Williams Act is to be taken as a congressional determination that a month (roughly) is enough time to force a tender offer to be kept open, 50 days is too much; and 50 days is the minimum under the Indiana act if the target corporation so chooses." *Id.*, at 263.

The court next addressed Dynamic's Commerce Clause challenge to the Act. Applying the balancing test articulated in *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137 (1970), the court found the Act unconstitutional:

> "Unlike a state's blue sky law the Indiana statute is calculated to impede transactions between residents of other states. For the sake of trivial or even negative benefits to its residents Indiana is depriving nonresidents of the valued opportunity to accept tender offers from other nonresidents.
>
> ". . . Even if a corporation's tangible assets are immovable, the efficiency with which they are employed and the proportions in which the earnings they generate are divided between management and shareholders depends on the market for corporate control—an interstate, indeed international, market that the State of Indiana is not authorized to opt out of, as in effect it has done in this statute." 794 F. 2d, at 264.

Finally, the court addressed the "internal affairs" doctrine, a "principle of conflict of laws . . . designed to make sure that the law of only one state shall govern the internal affairs of a corporation or other association." *Ibid.* It stated:

"We may assume without having to decide that Indiana has a broad latitude in regulating those affairs, even when the consequence may be to make it harder to take over an Indiana corporation. . . . But in this case the effect on the interstate market in securities and corporate control is direct, intended, and substantial. . . . [T]hat the mode of regulation involves jiggering with voting rights cannot take it outside the scope of judicial review under the commerce clause." *Ibid.*

Accordingly, the court affirmed the judgment of the District Court.

Both Indiana and CTS filed jurisdictional statements. We noted probable jurisdiction under 28 U. S. C. § 1254(2), 479 U. S. 810 (1986), and now reverse.[5]

## II

The first question in these cases is whether the Williams Act pre-empts the Indiana Act. As we have stated frequently, absent an explicit indication by Congress of an intent to pre-empt state law, a state statute is pre-empted only

---

[5] CTS and Dynamics have settled several of the disputes associated with Dynamics' tender offer for shares of CTS. The case is not moot, however, because the judgment of this Court still affects voting rights in the shares Dynamics purchased pursuant to the offer. If we were to affirm, Dynamics would continue to exercise the voting rights it had under the judgment of the Court of Appeals that the Act was pre-empted and unconstitutional. Because we decide today to reverse the judgment of the Court of Appeals, Dynamics will have no voting rights in its shares unless shareholders of CTS grant those rights in a meeting held pursuant to the Act. See Settlement Agreement, p. 7, par. 12, reprinted in letter from James A. Strain, Counsel for CTS, to Joseph F. Spaniol, Jr., Clerk of the United States Supreme Court (Mar. 13, 1987).

"'where compliance with both federal and state regulations is a physical impossibility . . . ,' *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142–143 (1963), or where the state 'law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941) . . . ." *Ray* v. *Atlantic Richfield Co.*, 435 U. S. 151, 158 (1978).

Because it is entirely possible for entities to comply with both the Williams Act and the Indiana Act, the state statute can be pre-empted only if it frustrates the purposes of the federal law.

### A

Our discussion begins with a brief summary of the structure and purposes of the Williams Act.   Congress passed the Williams Act in 1968 in response to the increasing number of hostile tender offers.   Before its passage, these transactions were not covered by the disclosure requirements of the federal securities laws.   See *Piper* v. *Chris-Craft Industries, Inc.*, 430 U. S. 1, 22 (1977).   The Williams Act, backed by regulations of the SEC, imposes requirements in two basic areas.   First, it requires the offeror to file a statement disclosing information about the offer, including: the offeror's background and identity; the source and amount of the funds to be used in making the purchase; the purpose of the purchase, including any plans to liquidate the company or make major changes in its corporate structure; and the extent of the offeror's holdings in the target company.   See 15 U. S. C. § 78n(d)(1) (incorporating § 78m(d)(1) by reference); 17 CFR §§ 240.13d–1, 240.14d–3 (1986).

Second, the Williams Act, and the regulations that accompany it, establish procedural rules to govern tender offers. For example, stockholders who tender their shares may withdraw them while the offer remains open, and, if the offeror has not purchased their shares, any time after 60 days from commencement of the offer.   15 U. S. C. § 78n(d)(5); 17

CFR § 240.14d–7(a)(1) (1986), as amended, 51 Fed. Reg. 25873 (1986). The offer must remain open for at least 20 business days. 17 CFR § 240.14e–1(a) (1986). If more shares are tendered than the offeror sought to purchase, purchases must be made on a pro rata basis from each tendering shareholder. 15 U. S. C. § 78n(d)(6); 17 CFR § 240.14(8) (1986). Finally, the offeror must pay the same price for all purchases; if the offering price is increased before the end of the offer, those who already have tendered must receive the benefit of the increased price. § 78n(d)(7).

## B

The Indiana Act differs in major respects from the Illinois statute that the Court considered in *Edgar* v. *MITE Corp.*, 457 U. S. 624 (1982). After reviewing the legislative history of the Williams Act, JUSTICE WHITE, joined by Chief Justice Burger and JUSTICE BLACKMUN (the plurality), concluded that the Williams Act struck a careful balance between the interests of offerors and target companies, and that any state statute that "upset" this balance was pre-empted. *Id.*, at 632–634.

The plurality then identified three offending features of the Illinois statute. JUSTICE WHITE's opinion first noted that the Illinois statute provided for a 20-day precommencement period. During this time, management could disseminate its views on the upcoming offer to shareholders, but offerors could not publish their offers. The plurality found that this provision gave management "a powerful tool to combat tender offers." *Id.*, at 635. This contrasted dramatically with the Williams Act; Congress had deleted express precommencement notice provisions from the Williams Act. According to the plurality, Congress had determined that the potentially adverse consequences of such a provision on shareholders should be avoided. Thus, the plurality concluded that the Illinois provision "frustrate[d] the objectives of the Williams Act." *Ibid.* The second criticized feature of

the Illinois statute was a provision for a hearing on a tender offer that, because it set no deadline, allowed management "'to stymie indefinitely a takeover,'" *id.*, at 637 (quoting *MITE Corp.* v. *Dixon*, 633 F. 2d 486, 494 (CA7 1980)). The plurality noted that "'delay can seriously impede a tender offer,'" 457 U. S., at 637 (quoting *Great Western United Corp.* v. *Kidwell*, 577 F. 2d 1256, 1277 (CA5 1978) (Wisdom, J.)), and that "Congress anticipated that investors and the takeover offeror would be free to go forward without unreasonable delay," 457 U. S., at 639. Accordingly, the plurality concluded that this provision conflicted with the Williams Act. The third troublesome feature of the Illinois statute was its requirement that the fairness of tender offers would be reviewed by the Illinois Secretary of State. Noting that "Congress intended for investors to be free to make their own decisions," the plurality concluded that "'[t]he state thus offers investor protection at the expense of investor autonomy—an approach quite in conflict with that adopted by Congress.'" *Id.*, at 639–640 (quoting *MITE Corp.* v. *Dixon*, *supra*, at 494).

## C

As the plurality opinion in *MITE* did not represent the views of a majority of the Court,[6] we are not bound by its reasoning. We need not question that reasoning, however, because we believe the Indiana Act passes muster even under the broad interpretation of the Williams Act articulated by JUSTICE WHITE in *MITE*. As is apparent from our summary of its reasoning, the overriding concern of the

---

[6] JUSTICE WHITE's opinion on the pre-emption issue, 457 U. S., at 630–640, was joined only by Chief Justice Burger and by JUSTICE BLACKMUN. Two Justices disagreed with JUSTICE WHITE's conclusion. See *id.*, at 646–647 (POWELL, J., concurring in part); *id.*, at 655 (STEVENS, J., concurring in part and concurring in judgment). Four Justices did not address the question. See *id.*, at 655 (O'CONNOR, J., concurring in part); *id.*, at 664 (MARSHALL, J., with whom BRENNAN, J., joined, dissenting); *id.*, at 667 (REHNQUIST, J., dissenting).

*MITE* plurality was that the Illinois statute considered in that case operated to favor management against offerors, to the detriment of shareholders. By contrast, the statute now before the Court protects the independent shareholder against the contending parties. Thus, the Act furthers a basic purpose of the Williams Act, " 'plac[ing] investors on an equal footing with the takeover bidder,' " *Piper* v. *Chris-Craft Industries, Inc.*, 430 U. S., at 30 (quoting the Senate Report accompanying the Williams Act, S. Rep. No. 550, 90th Cong., 1st Sess., 4 (1967)).[7]

The Indiana Act operates on the assumption, implicit in the Williams Act, that independent shareholders faced with tender offers often are at a disadvantage. By allowing such

---

[7] Dynamics finds evidence of an intent to favor management in several features of the Act. It argues that the provision of the Act allowing management to opt into the Act, see § 23–1–17–3(b), grants management a strategic advantage because tender offerors will be reluctant to take the expensive preliminary steps of a tender offer if they do not know whether their efforts will be subjected to the Act's requirements. But this provision is only a temporary option available for the first 17 months after enactment of the Act. The Indiana Legislature reasonably could have concluded that corporations should be allowed an interim period during which the Act would not apply automatically. Because of its short duration, the potential strategic advantage offered by the opportunity to opt into the Act during this transition period is of little significance.

The Act also imposes some added expenses on the offeror, requiring it, *inter alia*, to pay the costs of special shareholder meetings to vote on the transfer of voting rights, see § 23–1–42–7(a). In our view, the expenses of such a meeting fairly are charged to the offeror. A corporation pays the costs of annual meetings that it holds to discuss its affairs. If an offeror—who has no official position with the corporation—desires a special meeting solely to discuss the voting rights of the offeror, it is not unreasonable to have the offeror pay for the meeting.

Of course, by regulating tender offers, the Act makes them more expensive and thus deters them somewhat, but this type of reasonable regulation does not alter the balance between management and offeror in any significant way. The principal result of the Act is to grant shareholders the power to deliberate collectively about the merits of tender offers. This result is fully in accord with the purposes of the Williams Act.

shareholders to vote as a group, the Act protects them from the coercive aspects of some tender offers. If, for example, shareholders believe that a successful tender offer will be followed by a purchase of nontendering shares at a depressed price, individual shareholders may tender their shares—even if they doubt the tender offer is in the corporation's best interest—to protect themselves from being forced to sell their shares at a depressed price. As the SEC explains: "The alternative of not accepting the tender offer is virtual assurance that, if the offer is successful, the shares will have to be sold in the lower priced, second step." Two-Tier Tender Offer Pricing and Non-Tender Offer Purchase Programs, SEC Exchange Act Rel. No. 21079 (June 21, 1984), [1984 Transfer Binder] CCH Fed. Sec. L. Rep. ¶83,637, p. 86,916 (footnote omitted) (hereinafter SEC Release No. 21079). See Lowenstein, Pruning Deadwood in Hostile Takeovers: A Proposal for Legislation, 83 Colum. L. Rev. 249, 307–309 (1983). In such a situation under the Indiana Act, the shareholders as a group, acting in the corporation's best interest, could reject the offer, although individual shareholders might be inclined to accept it. The desire of the Indiana Legislature to protect shareholders of Indiana corporations from this type of coercive offer does not conflict with the Williams Act. Rather, it furthers the federal policy of investor protection.

In implementing its goal, the Indiana Act avoids the problems the plurality discussed in *MITE*. Unlike the *MITE* statute, the Indiana Act does not give either management or the offeror an advantage in communicating with the shareholders about the impending offer. The Act also does not impose an indefinite delay on tender offers. Nothing in the Act prohibits an offeror from consummating an offer on the 20th business day, the earliest day permitted under applicable federal regulations, see 17 CFR § 240.14e–1(a) (1986). Nor does the Act allow the state government to interpose its views of fairness between willing buyers and sellers of shares

of the target company.   Rather, the Act allows *shareholders* to evaluate the fairness of the offer collectively.

### D

The Court of Appeals based its finding of pre-emption on its view that the practical effect of the Indiana Act is to delay consummation of tender offers until 50 days after the commencement of the offer.   794 F. 2d, at 263.   As did the Court of Appeals, Dynamics reasons that no rational offeror will purchase shares until it gains assurance that those shares will carry voting rights.   Because it is possible that voting rights will not be conferred until a shareholder meeting 50 days after commencement of the offer, Dynamics concludes that the Act imposes a 50-day delay.   This, it argues, conflicts with the shorter 20-business-day period established by the SEC as the minimum period for which a tender offer may be held open.   17 CFR § 240.14e–1 (1986).   We find the alleged conflict illusory.

The Act does not impose an absolute 50-day delay on tender offers, nor does it preclude an offeror from purchasing shares as soon as federal law permits.   If the offeror fears an adverse shareholder vote under the Act, it can make a conditional tender offer, offering to accept shares on the condition that the shares receive voting rights within a certain period of time.   The Williams Act permits tender offers to be conditioned on the offeror's subsequently obtaining regulatory approval.   *E. g.*, Interpretive Release Relating to Tender Offer Rules, SEC Exchange Act Rel. No. 34–16623 (Mar. 5, 1980), 3 CCH Fed. Sec. L. Rep. ¶ 24,284I, p. 17,758, quoted in *MacFadden Holdings, Inc.* v. *JB Acquisition Corp.*, 802 F. 2d 62, 70 (CA2 1986).[8]   There is no reason to doubt that

---

[8] Although the SEC does not appear to have spoken authoritatively on this point, similar transactions are not uncommon.   For example, Hanson Trust recently conditioned consummation of a tender offer for shares in SCM Corporation on the removal of a "lockup option" that would have seriously diminished the value of acquiring the shares of SCM Corporation.

this type of conditional tender offer would be legitimate as well.[9]

Even assuming that the Indiana Act imposes some additional delay, nothing in *MITE* suggested that *any* delay imposed by state regulation, however short, would create a conflict with the Williams Act. The plurality argued only that the offeror should "be free to go forward without *unreasonable* delay." 457 U. S., at 639 (emphasis added). In that case, the Court was confronted with the potential for indefinite delay and presented with no persuasive reason why some deadline could not be established. By contrast, the Indiana Act provides that full voting rights will be vested—if this eventually is to occur—within 50 days after commencement of the offer. This period is within the 60-day period Congress established for reinstitution of withdrawal rights in 15 U. S. C. § 78n(d)(5). We cannot say that a delay within that congressionally determined period is unreasonable.

Finally, we note that the Williams Act would pre-empt a variety of state corporate laws of hitherto unquestioned validity if it were construed to pre-empt any state statute that may limit or delay the free exercise of power after a successful tender offer. State corporate laws commonly permit corporations to stagger the terms of their directors. See Model Business Corp. Act § 37 (1969 draft) in 3 Model Business Corp. Act Ann. (2d ed. 1971) (hereinafter MBCA); American

---

See *Hanson Trust PLC, HSCM* v. *ML SCM Acquisition Inc., ML L.B.O.,* 781 F. 2d 264, 272, and n. 7 (CA2 1986).

[9] Dynamics argues that conditional tender offers are not an adequate alternative because they leave management in place for three extra weeks, with "free rein to take other defensive steps that will diminish the value of tendered shares." Brief for Appellee 37. We reject this contention. In the unlikely event that management were to take actions designed to diminish the value of the corporation's shares, it may incur liability under state law. But this problem does not control our pre-emption analysis. Neither the Act nor any other federal statute can assure that shareholders do not suffer from the mismanagement of corporate officers and directors. Cf. *Cort* v. *Ash,* 422 U. S. 66, 84 (1975).

Bar Foundation, Revised Model Business Corp. Act § 8.06 (1984 draft) (1985) (hereinafter RMBCA).[10] By staggering the terms of directors, and thus having annual elections for only one class of directors each year, corporations may delay the time when a successful offeror gains control of the board of directors. Similarly, state corporation laws commonly provide for cumulative voting. See 1 MBCA § 33, ¶ 4; RMBCA § 7.28.[11] By enabling minority shareholders to assure themselves of representation in each class of directors, cumulative voting provisions can delay further the ability of offerors to gain untrammeled authority over the affairs of the target corporation. See Hochman & Folger, Deflecting Takeovers: Charter and By-Law Techniques, 34 Bus. Law. 537, 538–539 (1979).

In our view, the possibility that the Indiana Act will delay some tender offers is insufficient to require a conclusion that the Williams Act pre-empts the Act. The longstanding prevalence of state regulation in this area suggests that, if Congress had intended to pre-empt all state laws that delay the acquisition of voting control following a tender offer, it would have said so explicitly. The regulatory conditions that the Act places on tender offers are consistent with the text and the purposes of the Williams Act. Accordingly, we

---

[10] Every State except Arkansas and California allows classification of directors to stagger their terms of office. See 2 Model Business Corp. Act Ann. § 8.06, p. 830 (3d ed., Supp. 1986).

[11] "Cumulative voting is a means devised to protect minorities by providing a method of voting which assures to a minority, if it is sufficiently purposeful and cohesive, representation on the board of directors to an extent roughly proportionate to the minority's size. This is achieved by permitting each shareholder . . . to cast the total number of his votes for a single candidate for election to the board, or to distribute such total among any number of such candidates (the total number of his votes being equal to the number of shares he is voting multiplied by the number of directors to be elected)." 1 MBCA § 33, ¶ 4 comment. Every State permits cumulative voting. See 2 Model Business Corp. Act Ann. § 7.28, pp. 675–677 (3d ed., Supp. 1986).

hold that the Williams Act does not pre-empt the Indiana Act.

## III

As an alternative basis for its decision, the Court of Appeals held that the Act violates the Commerce Clause of the Federal Constitution. We now address this holding. On its face, the Commerce Clause is nothing more than a grant to Congress of the power "[t]o regulate Commerce . . . among the several States . . . ," Art. I, § 8, cl. 3. But it has been settled for more than a century that the Clause prohibits States from taking certain actions respecting interstate commerce even absent congressional action. See, *e. g.*, *Cooley* v. *Board of Wardens*, 12 How. 299 (1852). The Court's interpretation of "these great silences of the Constitution," *H. P. Hood & Sons, Inc.* v. *Du Mond*, 336 U. S. 525, 535 (1949), has not always been easy to follow. Rather, as the volume and complexity of commerce and regulation have grown in this country, the Court has articulated a variety of tests in an attempt to describe the difference between those regulations that the Commerce Clause permits and those regulations that it prohibits. See, *e. g.*, *Raymond Motor Transportation, Inc.* v. *Rice*, 434 U. S. 429, 441, n. 15 (1978).

## A

The principal objects of dormant Commerce Clause scrutiny are statutes that discriminate against interstate commerce. See, *e. g.*, *Lewis* v. *BT Investment Managers, Inc.*, 447 U. S. 27, 36–37 (1980); *Philadelphia* v. *New Jersey*, 437 U. S. 617, 624 (1978). See generally Regan, The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause, 84 Mich. L. Rev. 1091 (1986). The Indiana Act is not such a statute. It has the same effects on tender offers whether or not the offeror is a domiciliary or resident of Indiana. Thus, it "visits its effects equally upon both interstate and local business," *Lewis* v. *BT Investment Managers, Inc.*, *supra*, at 36.

Dynamics nevertheless contends that the statute is discriminatory because it will apply most often to out-of-state entities. This argument rests on the contention that, as a practical matter, most hostile tender offers are launched by offerors outside Indiana. But this argument avails Dynamics little. "The fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." *Exxon Corp.* v. *Governor of Maryland*, 437 U. S. 117, 126 (1978). See *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U. S. 456, 471–472 (1981) (rejecting a claim of discrimination because the challenged statute "regulate[d] evenhandedly . . . without regard to whether the [commerce came] from outside the State"); *Commonwealth Edison Co.* v. *Montana*, 453 U. S. 609, 619 (1981) (rejecting a claim of discrimination because the "tax burden [was] borne according to the amount . . . consumed and not according to any distinction between instate and out-of-state consumers"). Because nothing in the Indiana Act imposes a greater burden on out-of-state offerors than it does on similarly situated Indiana offerors, we reject the contention that the Act discriminates against interstate commerce.

## B

This Court's recent Commerce Clause cases also have invalidated statutes that may adversely affect interstate commerce by subjecting activities to inconsistent regulations. *E. g.*, *Brown-Forman Distillers Corp.* v. *New York State Liquor Authority*, 476 U. S. 573, 583–584 (1986); *Edgar* v. *MITE Corp.*, 457 U. S., at 642 (plurality opinion of WHITE, J.); *Kassel* v. *Consolidated Freightways Corp.*, 450 U. S. 662, 671 (1981) (plurality opinion of POWELL, J.). See *Southern Pacific Co.* v. *Arizona*, 325 U. S. 761, 774 (1945) (noting the "confusion and difficulty" that would attend the "unsatisfied need for uniformity" in setting maximum limits on train lengths); *Cooley* v. *Board of Wardens*, *supra*, at 319 (stating that the Commerce Clause prohibits States from regulating

subjects that "are in their nature national, or admit only of one uniform system, or plan of regulation"). The Indiana Act poses no such problem. So long as each State regulates voting rights only in the corporations it has created, each corporation will be subject to the law of only one State. No principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations, including the authority to define the voting rights of shareholders. See Restatement (Second) of Conflict of Laws § 304 (1971) (concluding that the law of the incorporating State generally should "determine the right of a shareholder to participate in the administration of the affairs of the corporation"). Accordingly, we conclude that the Indiana Act does not create an impermissible risk of inconsistent regulation by different States.

## C

The Court of Appeals did not find the Act unconstitutional for either of these threshold reasons. Rather, its decision rested on its view of the Act's potential to hinder tender offers. We think the Court of Appeals failed to appreciate the significance for Commerce Clause analysis of the fact that state regulation of corporate governance is regulation of entities whose very existence and attributes are a product of state law. As Chief Justice Marshall explained:

> "A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law. Being the mere creature of law, it possesses only those properties which the charter of its creation confers upon it, either expressly, or as incidental to its very existence. These are such as are supposed best calculated to effect the object for which it was created." *Trustees of Dartmouth College* v. *Woodward*, 4 Wheat. 518, 636 (1819).

See *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765, 822–824 (1978) (REHNQUIST, J., dissenting). Every State in this country has enacted laws regulating corporate gover-

nance.   By prohibiting certain transactions, and regulating others, such laws necessarily affect certain aspects of interstate commerce.   This necessarily is true with respect to corporations with shareholders in States other than the State of incorporation.   Large corporations that are listed on national exchanges, or even regional exchanges, will have shareholders in many States and shares that are traded frequently.   The markets that facilitate this national and international participation in ownership of corporations are essential for providing capital not only for new enterprises but also for established companies that need to expand their businesses.   This beneficial free market system depends at its core upon the fact that a corporation—except in the rarest situations—is organized under, and governed by, the law of a single jurisdiction, traditionally the corporate law of the State of its incorporation.

These regulatory laws may affect directly a variety of corporate transactions.   Mergers are a typical example.   In view of the substantial effect that a merger may have on the shareholders' interests in a corporation, many States require supermajority votes to approve mergers.   See, *e. g.*, 2 MBCA § 73 (requiring approval of a merger by a majority of all shares, rather than simply a majority of votes cast); RMBCA § 11.03 (same).   By requiring a greater vote for mergers than is required for other transactions, these laws make it more difficult for corporations to merge.   State laws also may provide for "dissenters' rights" under which minority shareholders who disagree with corporate decisions to take particular actions are entitled to sell their shares to the corporation at fair market value.   See, *e. g.*, 2 MBCA §§ 80, 81; RMBCA § 13.02.   By requiring the corporation to purchase the shares of dissenting shareholders, these laws may inhibit a corporation from engaging in the specified transactions.[12]

---

[12] Numerous other common regulations may affect both nonresident and resident shareholders of a corporation.   Specified votes may be required for the sale of all of the corporation's assets.   See 2 MBCA § 79; RMBCA

It thus is an accepted part of the business landscape in this country for States to create corporations, to prescribe their powers, and to define the rights that are acquired by purchasing their shares. A State has an interest in promoting stable relationships among parties involved in the corporations it charters, as well as in ensuring that investors in such corporations have an effective voice in corporate affairs.

There can be no doubt that the Act reflects these concerns. The primary purpose of the Act is to protect the shareholders of Indiana corporations. It does this by affording shareholders, when a takeover offer is made, an opportunity to decide collectively whether the resulting change in voting control of the corporation, as they perceive it, would be desirable. A change of management may have important effects on the shareholders' interests; it is well within the State's role as overseer of corporate governance to offer this opportunity. The autonomy provided by allowing shareholders collectively to determine whether the takeover is advantageous to their

§ 12.02. The election of directors may be staggered over a period of years to prevent abrupt changes in management. See 1 MBCA § 37; RMBCA § 8.06. Various classes of stock may be created with differences in voting rights as to dividends and on liquidation. See 1 MBCA § 15; RMBCA § 6.01(c). Provisions may be made for cumulative voting. See 1 MBCA § 33, ¶ 4; RMBCA § 7.28; n. 9, *supra*. Corporations may adopt restrictions on payment of dividends to ensure that specified ratios of assets to liabilities are maintained for the benefit of the holders of corporate bonds or notes. See 1 MBCA § 45 (noting that a corporation's articles of incorporation can restrict payment of dividends); RMBCA § 6.40 (same). Where the shares of a corporation are held in States other than that of incorporation, actions taken pursuant to these and similar provisions of state law will affect all shareholders alike wherever they reside or are domiciled.

Nor is it unusual for partnership law to restrict certain transactions. For example, a purchaser of a partnership interest generally can gain a right to control the business only with the consent of other owners. See Uniform Partnership Act § 27, 6 U. L. A. 353 (1969); Uniform Limited Partnership Act § 19 (1916 draft), 6 U. L. A. 603 (1969); Revised Uniform Limited Partnership Act §§ 702, 704 (1976 draft), 6 U. L. A. 259, 261 (Supp. 1986). These provisions—in force in the great majority of the States—bear a striking resemblance to the Act at issue in this case.

interests may be especially beneficial where a hostile tender offer may coerce shareholders into tendering their shares.

Appellee Dynamics responds to this concern by arguing that the prospect of coercive tender offers is illusory, and that tender offers generally should be favored because they reallocate corporate assets into the hands of management who can use them most effectively.[13]   See generally Easterbrook & Fischel, The Proper Role of a Target's Management in Responding to a Tender Offer, 94 Harv. L. Rev. 1161 (1981).   As indicated *supra,* at 82–83, Indiana's concern with tender offers is not groundless.   Indeed, the potentially coercive aspects of tender offers have been recognized by the SEC, see SEC Release No. 21079, p. 86,916, and by a number of scholarly commentators, see, *e. g.,* Bradley & Rosenzweig, Defensive Stock Repurchases, 99 Harv. L. Rev. 1377, 1412–1413 (1986); Macey & McChesney, A Theoretical Analysis of Corporate Greenmail, 95 Yale L. J. 13, 20–22 (1985); Lowenstein, 83 Colum. L. Rev., at 307–309.   The Constitution does not require the States to subscribe to any particular economic theory.   We are not inclined "to second-guess the empirical judgments of lawmakers concerning the utility of legislation," *Kassel* v. *Consolidated Freightways Corp.,* 450 U. S., at 679 (BRENNAN, J., concurring in judgment).   In our view, the possibility of coercion in some takeover bids offers additional justification for Indiana's decision to promote the autonomy of independent shareholders.

---

[13] It is appropriate to note when discussing the merits and demerits of tender offers that generalizations usually require qualification.   No one doubts that some successful tender offers will provide more effective management or other benefits such as needed diversification.   But there is no reason to *assume* that the type of conglomerate corporation that may result from repetitive takeovers necessarily will result in more effective management or otherwise be beneficial to shareholders.   The divergent views in the literature—and even now being debated in the Congress—reflect the reality that the type and utility of tender offers vary widely.   Of course, in many situations the offer to shareholders is simply a cash price substantially higher than the market price prior to the offer.

Dynamics argues in any event that the State has "'no legitimate interest in protecting the nonresident shareholders.'" Brief for Appellee 21 (quoting *Edgar* v. *MITE Corp.*, 457 U. S., at 644). Dynamics relies heavily on the statement by the *MITE* Court that "[i]nsofar as the . . . law burdens out-of-state transactions, there is nothing to be weighed in the balance to sustain the law." 457 U. S., at 644. But that comment was made in reference to an Illinois law that applied as well to out-of-state corporations as to in-state corporations. We agree that Indiana has no interest in protecting nonresident shareholders *of nonresident corporations*. But this Act applies only to corporations incorporated in Indiana. We reject the contention that Indiana has no interest in providing for the shareholders of its corporations the voting autonomy granted by the Act. Indiana has a substantial interest in preventing the corporate form from becoming a shield for unfair business dealing. Moreover, unlike the Illinois statute invalidated in *MITE*, the Indiana Act applies only to corporations that have a substantial number of shareholders in Indiana. See Ind. Code § 23–1–42–4(a)(3) (Supp. 1986). Thus, every application of the Indiana Act will affect a substantial number of Indiana residents, whom Indiana indisputably has an interest in protecting.

### D

Dynamics' argument that the Act is unconstitutional ultimately rests on its contention that the Act will limit the number of successful tender offers. There is little evidence that this will occur. But even if true, this result would not substantially affect our Commerce Clause analysis. We reiterate that this Act does not prohibit any entity—resident or nonresident—from offering to purchase, or from purchasing, shares in Indiana corporations, or from attempting thereby to gain control. It only provides regulatory procedures designed for the better protection of the corporations' shareholders. We have rejected the "notion that the Commerce

Clause protects the particular structure or methods of opera-
tion in a . . . market." *Exxon Corp.* v. *Governor of Mary-
land,* 437 U. S., at 127. The very commodity that is traded
in the securities market is one whose characteristics are de-
fined by state law. Similarly, the very commodity that is
traded in the "market for corporate control"—the corpora-
tion—is one that owes its existence and attributes to state
law. Indiana need not define these commodities as other
States do; it need only provide that residents and nonres-
idents have equal access to them. This Indiana has done.
Accordingly, even if the Act should decrease the number of
successful tender offers for Indiana corporations, this would
not offend the Commerce Clause.[14]

## IV

On its face, the Indiana Control Share Acquisitions Chap-
ter evenhandedly determines the voting rights of shares of
Indiana corporations. The Act does not conflict with the
provisions or purposes of the Williams Act. To the limited
extent that the Act affects interstate commerce, this is justi-
fied by the State's interests in defining the attributes of
shares in its corporations and in protecting shareholders.
Congress has never questioned the need for state regulation
of these matters. Nor do we think such regulation offends
the Constitution. Accordingly, we reverse the judgment of
the Court of Appeals.

*It is so ordered.*

JUSTICE SCALIA, concurring in part and concurring in the
judgment.

I join Parts I, III–A, and III–B of the Court's opinion.
However, having found, as those Parts do, that the Indiana

---

[14] CTS also contends that the Act does not violate the Commerce Clause—
regardless of any burdens it may impose on interstate commerce—because
a corporation's decision to be covered by the Act is purely "private" activ-
ity beyond the reach of the Commerce Clause. Because we reverse the
judgment of the Court of Appeals on other grounds, we have no occasion to
consider this argument.

Control Share Acquisitions Chapter neither "discriminates against interstate commerce," *ante,* at 88, nor "create[s] an impermissible risk of inconsistent regulation by different States," *ante,* at 89, I would conclude without further analysis that it is not invalid under the dormant Commerce Clause. While it has become standard practice at least since *Pike* v. *Bruce Church, Inc.,* 397 U. S. 137 (1970), to consider, in addition to these factors, whether the burden on commerce imposed by a state statute "is clearly excessive in relation to the putative local benefits," *id.,* at 142, such an inquiry is ill suited to the judicial function and should be undertaken rarely if at all. This case is a good illustration of the point. Whether the control shares statute "protects shareholders of Indiana corporations," Brief for Appellant in No. 86–97, p. 88, or protects incumbent management seems to me a highly debatable question, but it is extraordinary to think that the constitutionality of the Act should depend on the answer. Nothing in the Constitution says that the protection of entrenched management is any less important a "putative local benefit" than the protection of entrenched shareholders, and I do not know what qualifies us to make that judgment — or the related judgment as to how effective the present statute is in achieving one or the other objective — or the ultimate (and most ineffable) judgment as to whether, given importance-level $x,$ and effectiveness-level $y,$ the worth of the statute is "outweighed" by impact-on-commerce $z.$

One commentator has suggested that, at least much of the time, we do not in fact mean what we say when we declare that statutes which neither discriminate against commerce nor present a threat of multiple and inconsistent burdens might nonetheless be unconstitutional under a "balancing" test. See Regan, The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause, 84 Mich. L. Rev. 1091 (1986). If he is not correct, he ought to be. As long as a State's corporation law governs only its own corporations and does not discriminate against out-of-state interests, it should survive this Court's scrutiny under

the Commerce Clause, whether it promotes shareholder welfare or industrial stagnation. Beyond that, it is for Congress to prescribe its invalidity.

I also agree with the Court that the Indiana Control Share Acquisitions Chapter is not pre-empted by the Williams Act, but I reach that conclusion without entering into the debate over the purposes of the two statutes. The Williams Act is governed by the antipre-emption provision of the Securities Exchange Act of 1934, 15 U. S. C. § 78bb(a), which provides that nothing it contains "shall affect the jurisdiction of the securities commission (or any agency or officer performing like functions) of any State over any security or any person insofar as it does not conflict with the provisions of this chapter or the rules and regulations thereunder." Unless it serves no function, that language forecloses pre-emption on the basis of conflicting "purpose" as opposed to conflicting "provision." Even if it does not have literal application to the present case (because, perhaps, the Indiana agency responsible for securities matters has no enforcement responsibility with regard to this legislation), it nonetheless refutes the proposition that Congress meant the Williams Act to displace *all* state laws with conflicting purpose. And if any are to survive, surely the States' corporation codes are among them. It would be peculiar to hold that Indiana could have pursued the purpose at issue here through its blue-sky laws, but cannot pursue it through the State's even more sacrosanct authority over the structure of domestic corporations. Prescribing voting rights for the governance of state-chartered companies is a traditional state function with which the Federal Congress has never, to my knowledge, intentionally interfered. I would require far more evidence than is available here to find implicit pre-emption of that function by a federal statute whose provisions concededly do not conflict with the state law.

I do not share the Court's apparent high estimation of the beneficence of the state statute at issue here. But a law can

be both economic folly and constitutional. The Indiana Control Share Acquisitions Chapter is at least the latter. I therefore concur in the judgment of the Court.

JUSTICE WHITE, with whom JUSTICE BLACKMUN and JUSTICE STEVENS join as to Part II, dissenting.

The majority today upholds Indiana's Control Share Acquisitions Chapter, a statute which will predictably foreclose completely some tender offers for stock in Indiana corporations. I disagree with the conclusion that the Chapter is neither pre-empted by the Williams Act nor in conflict with the Commerce Clause. The Chapter undermines the policy of the Williams Act by effectively preventing minority shareholders, in some circumstances, from acting in their own best interests by selling their stock. In addition, the Chapter will substantially burden the interstate market in corporate ownership, particularly if other States follow Indiana's lead as many already have done. The Chapter, therefore, directly inhibits interstate commerce, the very economic consequences the Commerce Clause was intended to prevent. The opinion of the Court of Appeals is far more persuasive than that of the majority today, and the judgment of that court should be affirmed.

I

The Williams Act expressed Congress' concern that individual investors be given sufficient information so that they could make an informed choice on whether to tender their stock in response to a tender offer. The problem with the approach the majority adopts today is that it equates protection of individual investors, the focus of the Williams Act, with the protection of shareholders as a group. Indiana's Control Share Acquisitions Chapter undoubtedly helps protect the interests of a majority of the shareholders in any corporation subject to its terms, but in many instances, it will effectively prevent an individual investor from selling his stock at a premium. Indiana's statute, therefore, does not

"furthe[r] the federal policy of *investor* protection," *ante,* at 83 (emphasis added), as the majority claims.

In discussing the legislative history of the Williams Act, the Court, in *Piper* v. *Chris-Craft Industries, Inc.,* 430 U. S. 1 (1977), looked to the legislative history of the Williams Act and concluded that the Act was designed to protect individual investors, not management and not tender offerors: "The sponsors of this legislation were plainly sensitive to the suggestion that the measure would favor one side or the other in control contests; however, they made it clear that the legislation was designed solely to get needed information to the investor, the constant focal point of the committee hearings." *Id.,* at 30–31. The Court specifically noted that the Williams Act's legislative history shows that Congress recognized that some "takeover bids . . . often serve a useful function." *Id.,* at 30. As quoted by the majority, *ante,* at 82, the basic purpose of the Williams Act is "'plac[ing] *investors* on an equal footing with the takeover bidder.'" *Piper, supra,* at 30 (emphasis added).

The Control Share Acquisitions Chapter, by design, will frustrate individual investment decisions. Concededly, the Control Share Acquisitions Chapter allows the majority of a corporation's shareholders to block a tender offer and thereby thwart the desires of an individual investor to sell his stock. In the context of discussing how the Chapter can be used to deal with the coercive aspects of some tender offers, the majority states: "In such a situation under the Indiana Act, the shareholders as a group, acting in the corporation's best interest, could reject the offer, although individual shareholders might be inclined to accept it." *Ante,* at 83. I do not dispute that the Chapter provides additional protection for Indiana corporations, particularly in helping those corporations maintain the status quo. But it is clear to me that Indiana's scheme conflicts with the Williams Act's careful balance, which was intended to protect individual investors and permit them to decide whether it is in their best interests

to tender their stock.  As noted by the plurality in *MITE*, "Congress . . . did not want to deny shareholders 'the opportunities which result from the competitive bidding for a block of stock of a given company,' namely, the opportunity to sell shares for a premium over their market price.  113 Cong. Rec. 24666 (1967) (remarks of Sen. Javits)."  *Edgar* v. *MITE Corp.*, 457 U. S. 624, 633, n. 9 (1982).

The majority claims that if the Williams Act pre-empts Indiana's Control Share Acquisitions Chapter, it also pre-empts a number of other corporate-control provisions such as cumulative voting or staggering the terms of directors.  But this view ignores the fundamental distinction between these other corporate-control provisions and the Chapter: unlike those other provisions, the Chapter is designed to prevent certain tender offers from ever taking place.  It is transactional in nature, although it is characterized by the State as involving only the voting rights of certain shares.  "[T]his Court is not bound by '[t]he name, description or characterization given [a challenged statute] by the legislature or the courts of the State,' but will determine for itself the practical impact of the law."  *Hughes* v. *Oklahoma*, 441 U. S. 322, 336 (1979) (quoting *Lacoste* v. *Louisiana Dept. of Conservation*, 263 U. S. 545, 550 (1924)).  The Control Share Acquisitions Chapter will effectively prevent minority shareholders in some circumstances from selling their stock to a willing tender offeror.  It is the practical impact of the Chapter that leads to the conclusion that it is pre-empted by the Williams Act.

## II

Given the impact of the Control Share Acquisitions Chapter, it is clear that Indiana is directly regulating the purchase and sale of shares of stock in interstate commerce.  Appellant CTS' stock is traded on the New York Stock Exchange, and people from all over the country buy and sell CTS' shares daily.  Yet, under Indiana's scheme, any prospective purchaser will be effectively precluded from purchasing CTS'

shares if the purchaser crosses one of the Chapter's threshold ownership levels and a majority of CTS' shareholders refuse to give the purchaser voting rights. This Court should not countenance such a restraint on interstate trade.

The United States, as *amicus curiae*, argues that Indiana's Control Share Acquisitions Chapter "is written as a restraint on the *transferability* of voting rights in specified transactions, and it could not be written in any other way without changing its meaning. Since the restraint on the transfer of voting rights is a restraint on the transfer of shares, the Indiana Chapter, like the Illinois Act [in *MITE*], restrains 'transfers of stock by stockholders to a third party.'" Brief for Securities and Exchange Commission and United States as *Amici Curiae* 26. I agree. The majority ignores the practical impact of the Chapter in concluding that the Chapter does not violate the Commerce Clause. The Chapter is characterized as merely defining "the attributes of shares in its corporations," *ante,* at 94. The majority sees the trees but not the forest.

The Commerce Clause was included in our Constitution by the Framers to prevent the very type of economic protectionism Indiana's Control Share Acquisitions Chapter represents:

> "The few simple words of the Commerce Clause—'The Congress shall have Power . . . To regulate Commerce . . . among the several States . . .'—reflected a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Hughes, supra,* at 325–326.

The State of Indiana, in its brief, admits that at least one of the Chapter's goals is to protect Indiana corporations. The State notes that the Chapter permits shareholders "to deter-

mine . . . whether [a tender offeror] will liquidate the company or remove it from the State." Brief for Appellant in No. 86–97, p. 19. The State repeats this point later in its brief: "The Statute permits shareholders (who may also be community residents or employees or suppliers of the corporation) to determine the intentions of any offeror concerning the liquidation of the company or its possible removal from the State." *Id.*, at 90. A state law which permits a majority of an Indiana corporation's stockholders to prevent individual investors, including out-of-state stockholders, from selling their stock to an out-of-state tender offeror and thereby frustrate any transfer of corporate control, is the archetype of the kind of state law that the Commerce Clause forbids.

Unlike state blue sky laws, Indiana's Control Share Acquisitions Chapter regulates the purchase and sale of stock of Indiana corporations in interstate commerce. Indeed, as noted above, the Chapter will inevitably be used to block interstate transactions in such stock. Because the Commerce Clause protects the "interstate market" in such securities, *Exxon Corp.* v. *Governor of Maryland*, 437 U. S. 117, 127 (1978), and because the Control Share Acquisitions Chapter substantially interferes with this interstate market, the Chapter clearly conflicts with the Commerce Clause.

With all due respect, I dissent.