**Gregory SHEPARD, Plaintiff,**

v.

**MERIDIAN INSURANCE GROUP, INC., Ramon L. Humke, Norma J. Oman, Joseph D. Barnette, Jr., Thomas H. Sams, James D. Price, Sarah W. Rowland, David M. Kirr, and John T. Hackett, Defendants.**

**Cause No. IP00–1360–C–H/G.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

April 10, 2001.

Bryce H. Bennett, Jr., Riley Bennett & Egloff, Indianapolis, IN

John J. Soroko, Duane Morris & Heckscher, LLP, Phiadelphia, PA

Arthur P. Kalleres, Curtis W. McCauley, Ice Miller, Indianapolis, IN ·

## ENTRY ON DEFENDANTS' MOTION TO DISMISS

HAMILTON, District Judge.

The central questions in this diversity case are whether and how a dissenting shareholder of a publicly held Indiana corporation may seek relief from directors' alleged breaches of fiduciary duties in agreeing to a merger that will end the dissenter's ownership interest in the corporation. Plaintiff Gregory M. Shepard owns common stock of defendant Meridian Insurance Group, Inc., which the parties refer to as "MIGI" to distinguish it from related companies. Shepard has sued MIGI and its directors to enjoin a proposed merger between MIGI and a wholly-owned subsidiary of State Automobile Mutual Insurance Company ("State Auto"). MIGI and its directors have moved to dismiss this action entirely. In the alternative, defendants seek to have the case treated as a shareholder derivative action, and thus stayed until a special litigation committee decides whether to have MIGI itself pursue the claims.

As explained below, the court grants the defendants' motion to dismiss. The "dissenters' rights" provisions of the Indiana Business Corporation Law foreclose the injunctive relief Shepard seeks in this case. See Ind.Code § 23-1-44-8(c). If and when the merger is completed, Shepard might be able to pursue a direct action against the directors for monetary relief for an alleged breach of their duty to shareholders, though his claim would confront the highly deferential business judgment rule under Indiana law, see generally Ind.Code § 23-1-35-1 (business judgment

rule), and it is not clear whether Indiana law would recognize such claims even then. At this time, however, Shepard's claims for monetary relief are not ripe because MIGI's proposed merger with State Auto has not been consummated. The court thus grants defendants' motion to dismiss this action and enters final judgment to that effect, dismissing the claims for injunctive relief with prejudice and the claims for monetary relief without prejudice for lack of jurisdiction. Shepard's motion for a preliminary injunction is denied as moot.

### The Facts

Defendants seek dismissal of at least the claims for injunctive relief pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. The court therefore takes as true the well-pleaded factual allegations of the amended complaint. The facts stated here are taken from the amended complaint or are not inconsistent with it. MIGI is an Indiana corporation. Its stock is publicly traded. On August 29, 2000, its stock traded for $12.75 per share. On August 30, 2000, plaintiff Shepard announced his intention to commence a tender offer for 100 percent of MIGI shares for a price of $20 per share. At that point Shepard already owned about 20 percent of MIGI shares.

On September 8, 2000, MIGI's board of directors met and decided to recommend to MIGI shareholders that they reject Shepard's tender offer. The board followed that decision with a letter to all shareholders asserting that the offer price was inadequate and did not reflect the inherent value of the company. The board also wrote in its letter:

Based on Shepard's past history and experience in the insurance industry, it would not be in the best interests of the Company or its shareholders, employees, agents and policyholders and would

be detrimental to the long-term viability of the Company for Shepard to obtain control. Specifically, the Board is concerned with Shepard's involvement in the recent insolvency of Illinois Health Care Insurance Company, as noted above.

Amended Cplt. ¶ 22, Ex. 2.

On September 18, 2000, Shepard announced that he was amending his tender offer. Instead of seeking all MIGI shares, his September tender offer sought only 50.1 percent of the shares, but he increased the offered price to $25 per share.

The MIGI board met and decided to recommend that shareholders also reject Shepard's September tender offer. On September 22, 2000, the board again wrote to shareholders with that recommendation, emphasizing again Shepard's "past history and experience in the insurance industry." Amended Cplt. ¶ 27, Ex. 4. That factor, said the board, took on greater significance for shareholders because the tender for only 50.1 percent of shares would leave 49.9 percent of shares held by minority shareholders in a company controlled by Shepard. The board also advised shareholders that holders of more than 50 percent of MIGI shares had indicated they would reject the tender offer. Amended Cplt. Ex. 4. (Nearly 50 percent of MIGI shares are held by Meridian Mutual Insurance Company, which is well-represented on the MIGI board.)

On September 25, 2000, the Indiana Securities Commissioner held a hearing to evaluate the disclosures related to Shepard's tender offers. On October 4, 2000, the commissioner issued a decision requiring Shepard to make additional disclosures of financial and accounting information. He did not, however, issue a cease-and-desist order that would have blocked Shepard's tender offer.

The next day, after learning that the commissioner would not block the tender offer, the MIGI board issued a press release announcing that the board had directed management "to explore strategic alternatives to enhance shareholder value." Amended Cplt. ¶ 32. The alternatives included a variety of transactions, including possible mergers with third parties. The press release added: "The Board reconfirmed that the Company has no interest in engaging in any transaction with American Union Insurance Company, Gregory M. Shepard or any of their respective affiliates." On October 6, 2000, Shepard responded with his own press release announcing his intention to press forward with his tender offer despite the MIGI board's rejection of his efforts.

Also on October 6, 2000, MIGI and State Auto entered into an agreement for the exchange of confidential business information as a precursor to negotiating a merger or combination. Less than three weeks later, on October 25, 2000, MIGI announced that it had entered into a merger agreement with State Auto and a wholly owned subsidiary of State Auto known as "MIGI Acquisition."

Under the merger agreement, public shareholders of MIGI will be paid $30 per share. MIGI will survive as a wholly-owned subsidiary of State Auto. The merger agreement is subject to shareholder approval by MIGI shareholders. That vote has not yet been taken. The merger is also subject to a number of conditions and contingencies. The agreement requires that the merger be closed by July 1, 2001, although the parties may agree to further delays.

Shepard alleges that the MIGI directors breached their duties to shareholders in negotiating and agreeing to the proposed merger with State Auto. Shepard objects to many provisions of the merger agreement between MIGI and State Auto, including the $30 per share price, which his

counsel described to this court as "a steal." (That concession obviously tends to bolster the MIGI board's decision to recommend rejection of Shepard's earlier offers of $20 and $25 per share, but Shepard does not directly challenge those recommendations.)

The State Auto merger agreement includes a so-called "break-up fee" of $25 million, plus State Auto's expenses related to the deal. If the merger is consummated, the cash payout to MIGI's public shareholders will total more than $130 million, leading Shepard to assert that the break-up fee is disproportionate and punitive, so as to discourage any competing bids for control of MIGI.

The merger agreement also includes a "no solicitation" provision that Shepard contends sharply restricts the MIGI board's ability to entertain any competing offers for the company. He calculates that any competing bidder would need to be willing to pay at least $35 per share before it could even match the value of the State Auto bid as protected by the break-up fee.

The merger deal also includes a voting agreement under which Meridian Mutual agreed to vote its 48.6 percent of MIGI shares in favor of the State Auto merger and against approval of any other merger or business combination, except under certain conditions. State Auto also owns shares of MIGI, and State Auto's Schedule 13D filed with the SEC indicates it controls 54.6 percent of MIGI shares, including the Meridian Mutual shares. Thus, it's safe to say that prospects for MIGI shareholder approval of the State Auto merger are fairly bright. (Recall that Shepard owns about 20 percent, leaving about 25 percent of all the shares in other "public" hands.) Defendants point out that if the State Auto merger is consummated, Shepard will receive $47,652,000 in cash for his MIGI shares. Those same shares had a market value of just $20,252,100 the day

before Shepard announced his first tender offer.

### The Claims and Issues

On December 8, 2000, Shepard filed the amended complaint in this action and announced that he was withdrawing his own tender offer. In a nutshell, Shepard alleges that the MIGI directors breached their duties to him and to other shareholders by failing to exercise reasonable care and by failing to secure a better offer for MIGI shares. He seeks injunctive relief to block consummation of the State Auto merger, as well as compensatory and punitive damages.

Defendants contend that the dissenters' rights provisions of Indiana corporation law require dismissal of Shepard's claims. Defendants do not argue, however, that Indiana law bars all remedies in this situation. According to defendants, Shepard's claims could be brought only as derivative claims belonging to the corporation itself, so that the requirements for a shareholder derivative actions would have to be met. Defendants assert that both injunctive and monetary relief could be available in a derivative action. The defendant directors have appointed a special litigation committee to evaluate the potential derivative claims.

MIGI is an Indiana corporation, so its internal affairs are governed by Indiana law. See *CTS Corp. v. Dynamics Corp. of America,* 481 U.S. 69, 89, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987) ("No principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations, including the authority to define the voting rights of shareholders."), citing Restatement (Second) of Conflict of Laws § 304 (1971). In 1985 and 1986, Indiana completely rewrote its Business Corporation Law ("BCL") with the help of an expert study commission. The rewritten statute, found in Title

23 of the Indiana Code, includes some innovative features that apply to changes of control and other major corporate transactions. See generally *CTS Corp.*, 481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67 (upholding constitutionality of Indiana "control share acquisition" chapter's restrictions on voting rights of controlling shares); *G & N Aircraft, Inc. v. Boehm*, 743 N.E.2d 227, 243 (Ind.2001) (noting that Indiana BCL was enacted "at the highwater of concern for excessive ease of takeover of publicly traded companies").

In this case, the defendants rely primarily on the dissenters' rights chapter of the BCL found in Ind.Code § 23–1–44–1 *et seq.* In general, if a corporation's stock is not publicly traded, the dissenters' rights chapter allows a shareholder who disagrees with a proposed merger or other major transaction to vote against the transaction and to require the corporation to purchase his or her shares for fair value. Ind.Code § 23–1–44–8. If the corporation and the dissenting shareholder are unable to agree on a value for the shares, the chapter requires the corporation to file a judicial appraisal proceeding in which the court determines "fair value." Ind.Code § 23–1–44–19.

An important feature of the dissenters' rights chapter is that it limits the rights of dissenting shareholders to the specified remedies. Section 23–1–44–8 provides in its entirety:

(a) A shareholder is entitled to dissent from, and obtain payment of the fair value of the shareholder's shares in the event of, any of the following corporate actions:

(1) Consummation of a plan of merger to which the corporation is a party if:

(A) shareholder approval is required for the merger by IC 23–1–40–3 or the articles of incorporation; and

(B) the shareholder is entitled to vote on the merger.

(2) Consummation of a plan of share exchange to which the corporation is a party as the corporation whose shares will be acquired, if the shareholder is entitled to vote on the plan.

(3) Consummation of a sale or exchange of all, or substantially all, of the property of the corporation other than in the usual and regular course of business, if the shareholder is entitled to vote on the sale or exchange, including a sale in dissolution, but not including a sale pursuant to court order or a sale for cash pursuant to a plan by which all or substantially all of the net proceeds of the sale will be distributed to the shareholders within one (1) year after the date of sale.

(4) The approval of a control share acquisition under IC 23–1–42.

(5) Any corporate action taken pursuant to a shareholder vote to the extent the articles of incorporation, bylaws, or a resolution of the board of directors provides that voting or nonvoting shareholders are entitled to dissent and obtain payment for their shares.

(b) This section does not apply to the holders of shares of any class or series if, on the date fixed to determine the shareholders entitled to receive notice of and vote at the meeting of shareholders at which the merger, plan of share exchange, or sale or exchange of property is to be acted on, the shares of that class or series were:

(1) registered on a United States securities exchange registered under the Exchange Act (as defined in IC 23–1–43–9); or

(2) traded on the National Association of Securities Dealers, Inc. Automated Quotations System Over–the–Counter Markets—National Market Issues or a similar market.

(c) A shareholder:

    (1) who is entitled to dissent and obtain payment for the shareholder's shares under this chapter; or

    (2) who would be so entitled to dissent and obtain payment but for the provisions of subsection (b);

may not challenge the corporate action creating (or that, but for the provisions of subsection (b), would have created) the shareholder's entitlement.

For purposes of the State Auto merger, MIGI shareholder approval is required, and Shepard is entitled to vote on the proposed merger. The transaction therefore falls within Section 8(a), so that, but for the effects of the "market exception" in subsection (b), Shepard would have dissenters' rights of appraisal. Because MIGI's stock is publicly traded, however, the exception in subsection (b) applies. Thus, if the proposed merger is approved, Shepard will not be able to obtain a judicial appraisal of the value of his shares of MIGI pursuant to the dissenters' rights chapter.

Defendants base their motion to dismiss on subsection (c): Shepard would be entitled to dissent and obtain payment but for the provisions of subsection (b). Where subsection (c) applies, the dissenting shareholder "may not challenge the corporate action" in question.

The Supreme Court of Indiana has recognized that subsection (c) was drafted so as to preclude such a "challenge" to the "corporate action" even when the corporate action is alleged or proven to have been unlawful or fraudulent. *Fleming v. International Pizza Supply Corp.*, 676 N.E.2d 1051, 1055–57 (Ind.1997). In *Fleming* the state court reviewed in detail the adoption of the Indiana BCL. The court noted that the legislature deliberately chose not to adopt language from the dissenters' rights provisions of the Revised Model Business Corporation Act, which barred dissenting shareholders from challenging the corporate action in question "unless the action is unlawful or fraudulent with respect to the shareholder or the corporation." *Id.* at 1054.

The study commission that drafted the Indiana BCL also issued official comments. The legislature approved those comments and the Supreme Court of Indiana has recognized them as authoritative. See *Fleming*, 676 N.E.2d at 1054 n. 5. The commission's comments on Section 8(c) made the general purpose unmistakable:

Subsection (c), which establishes the exclusivity of Chapter 44's dissenters' rights remedies, deletes RMA language stating that such rights are exclusive "unless the action is unlawful or fraudulent with respect to the shareholder or the corporation." Deletion of this language reflects a conscious response to the Indiana Supreme Court's decision in *Gabhart v. Gabhart*, 267 Ind. 370, 370 N.E.2d 345 (1977).

*Gabhart* involved the interpretation of the GCA's exclusivity provision, IC 23–1–5–7(c), which provided:

Every shareholder who did not vote in favor of such merger, consolidation, or exchange and who does not object in writing and demand payment of the value of his shares at the time and in the manner stated in this section shall be conclusively presumed to have assented to such merger, consolidation, or exchange.

Notwithstanding this language, the *Gabhart* Court held that a minority shareholder was entitled to challenge a "freeze-out" merger as a de facto dissolution if the merger did not have a "valid purpose"—defined by the Court as a purpose intended to advance a corporate interest. *Gabhart* refused to adopt the approach of the then-leading Delaware case, *Singer v. Magnavox Co.*, 380 A.2d 969 (Del.1977) (later overruled in *Wein-*

*berger v. UOP, Inc.*, 457 A.2d 701, 703 (Del.1983)), which permitted judicial inquiry into the entire fairness of the transaction on the basis of fiduciary duty owed to minority shareholders. The *Gabhart* Court also found that IC 23–1–5–7(c) did establish the exclusive remedy for mergers with a "valid purpose." Absent such a "valid purpose," however, *Gabhart* held that minority shareholders were not limited to statutory appraisal rights but could also seek to enjoin the corporate transaction creating those rights.

Whether or not *Gabhart* correctly interpreted the GCA's exclusivity provision, the Commission believed the decision created substantial uncertainty about whether and to what extent minority shareholders could seek to enjoin or undo corporate transactions authorized by statute and approved by the majority. *Given the potential for disruption of corporate transactions were a Gabhart rule applied to the BCL, the General Assembly adopted subsection (c) as a categorical statutory rule that shareholders entitled to dissenters' rights may not challenge the corporate action creating that entitlement.* Hence, the kind of minority shareholder challenge to corporate action permitted by *Gabhart* under IC 23–1–5–7(c) is not permitted under subsection (c).

In 1987, subsection (c) was amended to extend this categorical prohibition to shareholders who would be entitled to dissenters' rights but for the "market exception" of subsection (b). Such shareholders, who have the ability to sell their shares in a recognized market and at a market price, also may not challenge the corporate action that (but for

the "market exception") would have created dissenters' rights.

Official Comments to Ind.Code § 23–1–44–8 (emphasis added). The dissenters' rights statute thus reflects a strong and deliberate commitment by the Indiana General Assembly to restrict sharply the ability of a shareholder to challenge corporate action with which the shareholder disagrees.

If not for the exception in Section 8(b) for publicly traded companies, this would be a simple case. A shareholder who dissents from a merger of a privately held company may reject the company's offer of "fair value," which forces the company to file a judicial appraisal proceeding under the dissenters' rights statute to determine "fair value" for the shares pursuant to Ind.Code § 23–1–44–19. That judicial proceeding provides an adequate remedy if a wrong is proven, and Section 8(c) bars any request for additional relief, including injunctive relief, in those circumstances. See *Young v. General Acceptance Corp.*, 738 N.E.2d 1079, 1091–92 (Ind.App.2000) (dissenting shareholders could pursue in an appraisal proceeding their claim for alleged fraud in proxy statement on proposed merger);[1] *Settles v. Leslie*, 701 N.E.2d 849, 853–54 (Ind. App.1998) (dissenting shareholders in closely held corporation could have sought remedy in appraisal proceeding). Because of the "market exception" in Section 8(b), however, the parties here agree that the judicial remedy established by Ind.Code § 23–1–44–19 for payment of "fair value" is not available to Shepard.

The market exception in Section 8(b) leaves Shepard with the ability to sell his shares of MIGI at the market price. In many situations, such a sale may provide a

---

**1.** The stock of the corporation in question in *Young* was publicly traded, see 738 N.E.2d at 1083, but the court's opinion did not address the issue of the "market exception" to dissenters' rights under Ind.Code § 23–1–44–8(b).

dissenting shareholder with an adequate remedy. The market exception is based on the assumption that the market price of the shares reflect a current fair valuation of those shares. Even if officers and directors have breached their duties in ways that have depressed the price of the stock (for example, by agreeing to a sale of assets at too low a price), one could expect, at least theoretically, that the market price would also include an adjustment or valuation for any potential shareholder derivative claims against the officers or directors for earlier wrongs.

Because the proposed merger with State Auto is a "cash-out" merger, Shepard contends that a sale of his shares at the market price would not provide him with a meaningful remedy for the wrongs he alleges here. The market price for MIGI stock reflects the agreed price for the merger. Shepard claims that the directors breached their duties by agreeing to that very price. Also, there is no reason to expect that the prospect of any future derivative claims could be factored into that price. As discussed below, if and when the merger closes, all the shareholders hurt by the alleged wrongs will lose their shares and thus also their standing to pursue such claims.

Indiana has adopted by statute "a strongly pro-management version of the business judgment rule." *G & N Aircraft, Inc.*, 743 N.E.2d at 238 (describing Ind. Code § 23–1–35–1(e)). A director is not personally liable for actions taken or not taken as a director so long as the director was informed, acted in good faith, and exercised "honest judgment in the lawful and legitimate furtherance of corporate purposes." *Id.* The court starts with a presumption that the directors satisfied that standard, and proof of negligence is insufficient to overcome the presumption. A plaintiff must prove willful misconduct or recklessness. *Id.*

This substantive protection for directors is extensive, but not absolute. In deciding defendants' motion to dismiss under Rule 12(b)(6), therefore, the court must assume that plaintiff Shepard would be able to prove that the defendant directors willfully or recklessly breached their duties in deciding to approve the State Auto merger. The decisive issues are whether and how Indiana law would provide shareholders or the corporation any remedy for the directors' assumed breach of their duty of loyalty and due care to the corporation and to its shareholders when approving a cash-out merger for a publicly traded corporation. See Ind.Code § 23–1–35–1 (describing directors' duties). The parties and the court have considered four distinct options.

Option 1—there is no judicial remedy at all. Under this option, as applied to a publicly traded company, Section 8(c) of the dissenters' rights chapter would be read to preclude any "challenge" leading to any kind of judicial remedy at all, both injunctions against the challenged merger and monetary awards against the corporation or its directors. Neither party in this case actually advocates this approach, but it is not an unreasonable reading of Section 8(c) and the official comments, even as applied to a cash-out merger.

Option 2—a dissenting shareholder's only judicial remedy is to obtain an injunction before the merger is actually consummated. Plaintiff Shepard argues that some effective remedy for dissenting shareholders is necessary, and that Section 8(c) of the dissenters' rights chapter should be construed in this manner so as not to prohibit such injunctions before the transaction is consummated.

Option 3—a shareholder's only remedy is to try to initiate a shareholder derivative action seeking an injunction before the merger is actually consummated. Defendants advocate this approach.

They contend that Section 8(c) does not apply to such injunctions because the relief would be sought in the name of the corporation, not any one shareholder.

Option 4—Section 8(c) prohibits injunctions against the merger upon the request of a dissenting shareholder, but a shareholder who has been cashed out may sue directors and officers for money after consummation of the merger, perhaps through a class action on behalf of other shareholders. Under this approach, no shareholder could obtain a court injunction, but a shareholder who is wronged by a director's or officer's breach of duty to shareholders could sue in his or her own name to recover money from those responsible for the wrong. Such a suit would encounter the highly deferential business judgment rule under Indiana's BCL, but money would be available upon sufficient proof of wrongdoing.

When this federal district court exercises its diversity jurisdiction, its task is to make its best prediction of how the Supreme Court of Indiana would decide the issue. *E.g., General Accident Ins. Co. of America v. Gonzales,* 86 F.3d 673, 675 (7th Cir.1996); *Trytko v. Hubbell, Inc.,* 28 F.3d 715, 719–20 (7th Cir.1994). Each of these four options confronts difficulties in terms of statutory language, Indiana case law, and/or the policies that the Indiana courts would try to balance in these circumstances. In fact, the strongest arguments in favor of each option are the problems posed by the others.

■ Option 1—no judicial remedy—is easy to reconcile with the language and purpose of Section 8(c). The statute provides that the dissenting shareholder "may not challenge the corporate action" in question. Section 8(c) was written to establish "the exclusivity of Chapter 44's dissenters' rights remedies." Official Comments to Ind.Code § 23–1–44–8(c). The statute creates a "categorical statutory rule that shareholders entitled to dissenters' rights may not challenge the corporate action creating that entitlement." *Id.* The statute was amended in 1987 "to extend this categorical prohibition to shareholders who would be entitled to dissenters' rights but for the 'market exception' of subsection (b). Such shareholders, who have the ability to sell their shares in a recognized market and at a market price, also may not challenge the corporate action that (but for the 'market exception') would have created dissenters' rights." *Id.*

The problem with Option 1 arises when the transaction in question is a merger of the publicly held corporation in which shareholders receive either cash or a fixed amount of other securities in return for their shares. If the directors have wrongfully agreed to an unfairly low price or exchange ratio, the option of selling shares on the open market is not really a remedy at all. The market price should be consistent with the agreed price or value for the merger (probably with a small discount for contingencies before the merger is consummated). Thus, Option 1 leaves a shareholder wronged by directors' approval of a merger without any meaningful remedy at all, whether in the courts or in the market.

Despite the absence of an effective remedy, this option might well be a reasonable policy choice. This is a field of law where the potential for strike suits is high. Also, other legal and practical mechanisms, such as disclosure requirements and other regulations under federal securities laws, regulate the conduct of directors of publicly traded corporations.

Although Option 1 offers the prospect of immunity from any shareholder challenge to the proposed merger in court, defen-

dants in this case have not advocated this approach. They point to the *Fleming* decision, in which the Supreme Court of Indiana showed a strong reluctance to foreclose all judicial remedies for a director's breach of duty. In *Fleming* a minority shareholder dissented from the sale of substantially all corporate assets and sought the appraisal remedy under the dissenters' rights chapter. The shareholder also alleged claims for fraud and breach of fiduciary duty. The Supreme Court held that the shareholder's claims for fraud and breach of fiduciary duty could be raised as part of the appraisal case. 676 N.E.2d at 1057. While the *Fleming* court acknowledged the exclusivity of remedies under the dissenters' rights chapter, the court observed that shareholders in a closely held corporation have fiduciary obligations to one another, and it "follow[ed], therefore, that a shareholder suffering compensatory damages proximately caused by the breach of such fiduciary duty or fraud must have a remedy therefor." 676 N.E.2d at 1056, citing Indiana Const. art. I, § 12 ("[E]very person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law."); see also *Settles*, 701 N.E.2d at 855 (noting "there probably are limits on this principle [of exclusivity]" in Section 8(c), and quoting this portion of *Fleming* ).

The Supreme Court of Indiana therefore held in *Fleming* that shareholders pursuing their appraisal remedy under the dissenters' rights chapter could raise a range of issues, including allegations of earlier wrongs harming the corporation. That approach ensured that an effective monetary remedy was available for such breaches of duty. 676 N.E.2d at 1057–58. The *Flem-*

*ing* court strongly endorsed the view that the dissenters' rights chapter provides exclusive remedies for shareholders where it applies. See 676 N.E.2d at 1056–57; see also *Galligan v. Galligan*, 741 N.E.2d 1217, 1225–26 (Ind.2001) (dissenters' rights are the exclusive remedy afforded for actions or omissions in a merger or asset sale). In the case of a merger of a publicly held corporation, however, where the dissenters' rights chapter appears to leave no judicial remedy at all, the state courts have not clearly indicated they are willing to take that step.[2] The dissenting shareholder can sell the shares at a current market price, but that price must be assumed to have been deflated by the wrongdoing in question.

In sum, the Indiana courts might reasonably conclude that there is no judicial remedy available to someone in Shepard's position, but it appears to this court more likely that the Supreme Court of Indiana would try to craft some sort of appropriate remedy consistent with the legislature's clear policy decision not to allow injunctive relief and to minimize legal disruptions of transactions approved by a majority of shareholders.

■ Option 2 is plaintiff Shepard's preference—a shareholder unhappy with a merger agreement can obtain an injunction as long as she acts before the merger is consummated. Section 8(c) provides that a dissenting shareholder "may not challenge the corporate action." Plaintiff reads this language as referring only to a corporate action *already taken.* He contends there has not been what he calls a "triggering event." Without such a triggering event, Shepard argues, his request for a preliminary injunction "would not be

**2.** The possible exception is *Young v. General Acceptance Corp.*, which addressed a cash-out merger of a publicly traded corporation. See 738 N.E.2d at 1083. The court did not ad-

dress the effect of the "market exception," however, so the opinion offers limited guidance for this case, where the exception plainly applies.

the 'disruption' subsection (c) was intended to address." Pl. Br. at 23.

Plaintiff Shepard bases his argument on snippets of language from several Indiana cases and the official comments on Section 8(c). The official comments state that the *Gabhart* decision had created "substantial uncertainty about whether and to what extent minority shareholders could seek to enjoin or undo corporate transactions authorized by statute and approved by the majority." Shepard contends the use of the past tense in "approved" means that the exclusivity provision does not apply where the transaction has not yet been approved.

The use of the past tense in that one word will not bear the weight Shepard has tried to load upon it. Apart from the fact that Shepard's interpretation of Section 8(c) would turn it upside down, as discussed below, the comments show the statute addressed efforts "to enjoin or undo" transactions, and the next sentence of the comments focused on "the potential for disruption of corporate transactions." Such potential for disruption exists whether or not the shareholder vote has been taken when suit is filed or an injunction is issued.

Shepard also cites *Young v. General Acceptance Corp.*, in which dissenting shareholders sought to rescind an approved and completed merger. The dissenting share-holders argued that the merger was void because it had been approved by means of a violation of the control share acquisition provisions of the BCL. In summarizing the plaintiffs' argument, the court wrote: "If there was no merger, then there was no corporate action to trigger the Dissenters' Rights Statute, and the exclusivity provision does not bar their current action." 738 N.E.2d at 1091. Shepard's reliance on that passage summarizing the losing parties' position does not support his argument. The *Young* court never actually addressed that theory because it found there had been no violation of the control share acquisition chapter. *Id.*[3]

Shepard's argument in support of Option 2 is creative but not persuasive. First, it is not consistent with Indiana case law. In both *Young* and *Settles,* suit was filed before the transactions in question had been consummated, and the Indiana courts applied Section 8(c). See *Young,* 738 N.E.2d at 1084, 1091–92 (suit filed before shareholder vote seeking injunction to block largest shareholder from voting on cash-out merger proposal; Section 8(c) applied to bar remedies other than statutory appraisal); *Settles,* 701 N.E.2d at 851 (suit filed before shareholder vote on proposed merger; trial court denied temporary restraining order to block vote). If Shepard's argument were correct, both courts should have allowed the cases to

---

**3.** Shepard also cites the Court of Appeals decision in *G & N Aircraft, Inc. v. Boehm,* 703 N.E.2d 665, 675 n. 6 (Ind.App.1998). That decision was vacated by *G & N Aircraft, Inc.,* 743 N.E.2d at 243, which held that the dissenters' rights chapter did not foreclose other types of remedies when no listed transaction was actually at issue. Shepard also cites language from *Settles,* 701 N.E.2d at 853, which referred to consummation of a merger triggering the right to claim fair value. The fact that the fair value remedy is not ripe until the merger has been consummated does not limit the scope of the entire structure of the chap- ter, which requires notice of dissenters' rights no later than when the corporation sends notice of the shareholder vote or notice of an action for which a shareholder vote is not required. See Ind.Code § 23–1–44–10. Shepard also quotes 19 Am.Jur.2d *Corporations* § 2577 (1999), for what he calls "black-letter law" approving of actions to enjoin unfair mergers. The Indiana BCL in general and Section 8 in particular reflect careful and deliberate legislative decisions to change some long-established rules of "black letter law," including the remedies for challenging mergers.

proceed by holding that Section 8(c) did not apply before the shareholder votes.

Second, and more fundamental, accepting Shepard's argument would completely undermine both the plain language and clear purpose of Section 8(c): to prevent court battles over whether to enjoin or undo major corporate transactions like mergers. Section 8(c) bars a "challenge" to the "corporate action," without limitation on whether the action has received final, formal approval. The official comments on Section 8(c) state: "the Commission believed the [*Gabhart*] decision created substantial uncertainty about whether and to what extent minority shareholders could seek to enjoin or undo corporate transactions authorized by statute and approved by the majority." In *Fleming* the Supreme Court of Indiana explained "that the legislature's approach incorporated *Gabhart's* teachings that a shareholder's appraisal right could not be enforced by enjoining the merger." 676 N.E.2d at 1056, citing *Gabhart*, 370 N.E.2d at 353. In *Galligan* the Supreme Court of Indiana observed that "the statutory scheme strongly favors majority rule and finality of corporate transactions." 741 N.E.2d at 1225, citing *Fleming*, 676 N.E.2d at 1057.

Under plaintiff's argument, the exclusivity provision in Section 8(c) that was written to *prevent* such cases seeking injunctions would be turned on its head. It would instead encourage shareholders unhappy about a proposed transaction to run to court as quickly as possible, before any shareholder vote could be taken. The Indiana courts have not indicated any intention of interpreting Section 8(c) in such a way. Such an interpretation is highly improbable.

█ Option 3—a derivative action seeking an injunction to block the merger—is defendants' choice. The strongest argument in favor of Option 3 is the weakness of the other options: that some remedy is needed, so Option 1 seems unlikely, and plaintiffs' Option 2 inviting an early race to the courthouse also is not acceptable. The strongest argument against Option 3 is that it still leaves the courts open for injunctive relief to block the proposed merger. That result seems to preserve exactly what Section 8(c) was written to prohibit.

A shareholder derivative action is a procedural device by which a shareholder asserts a claim for relief for the benefit of the corporation itself. See Ind.Code § 23–1–32–1 *et seq.* (statutory provisions for derivative actions); Ind. Trial Rule 23.1 (procedures for derivative actions); *G & N Aircraft*, 743 N.E.2d at 234 (discussing derivative actions generally). Derivative actions are brought in the name of the corporation to remedy a wrong committed against the corporation itself. In a successful derivative action, any recovery of damages is paid to the corporation itself. See *G & N Aircraft*, 743 N.E.2d at 246; *W & W Equipment Co., Inc. v. Mink*, 568 N.E.2d 564, 571 (Ind.App.1991) (payment of recovery to corporation protects interests of creditors and other shareholders). Thus, the indirect beneficiaries of the claim are the shareholders of the corporation at the time of the recovery.

A derivative action would be subject to the requirements of the BCL's chapter on derivative actions. Ind.Code § 23–1–32–1 *et seq.* The board of directors may appoint a special litigation committee, as the MIGI board has done in this case. The members must be disinterested in the claim in question. If the special litigation committee decides not to pursue the claim, that determination is conclusive unless a shareholder can prove to a court that the committee was not actually "disinterested" or made its determination without conducting an investigation in good faith. Ind.Code § 23–1–32–4(c); *Cutshall v. Barker*, 733

N.E.2d 973, 982 (Ind.App.2000) (affirming dismissal of derivative claim based on special litigation committee determination).

Where the transaction in question is a merger that forces a shareholder to exchange shares for cash and/or other securities, a shareholder derivative action is not a suitable procedure for asserting the rights Shepard seeks to assert. This would be so even if Shepard were seeking only monetary relief after the merger had closed. If, as is alleged in this case, directors have wrongly agreed to an unfairly low merger price, the persons who benefit from that low price are those who acquire shares in the company at that unfairly low price. If the result of a successful derivative action is a recovery of money from the directors (or their insurer) on behalf of the corporation, then the new shareholders who benefited from the low price would also receive the benefits of the recovery in the name of the corporation. Such a recovery in the name of the corporation would provide no benefits to the former shareholders who were forced to cash in their shares for an inadequate price.

The other problem with using a derivative action to remedy an inadequate price in a cash-out merger is that a person ordinarily loses standing to pursue a derivative action when he or she ceases to own shares in the corporation. As a general rule, only a current shareholder in a corporation may bring a shareholder derivative action. See *Griffin*, 541 N.E.2d at 555 (ordering dismissal of derivative action brought by shareholders who sold shares while case was pending; merger that eliminated ownership of corporation's stock also eliminated a former shareholder's standing to bring derivative action), citing, among other cases, *Portnoy v. Kawecki*, 607 F.2d 765, 767 (7th Cir.1979), and *Kramer v. Western Pacific Industries*, 546 A.2d 348, 354 (Del.1988); see also *Gabhart*,

370 N.E.2d at 356–57 (recognizing general rule).

Delaware corporation law addresses the problem for shareholders in cash-out mergers by allowing direct claims by shareholders. *Parnes v. Bally Entertainment*, 722 A.2d 1243, 1245–46 (Del.1999); *Smith v. Van Gorkom*, 488 A.2d 858, 893 (Del.1985) (shareholders whose rights were violated by directors' approval of cash-out merger could recover damages in direct action against corporate directors).

Defendants contend the Indiana courts would solve the problem differently. The Supreme Court of Indiana recognized this problem in *Gabhart* itself, a case in which majority shareholders of a closely held corporation had approved a merger that had the effect of freezing out a minority shareholder, who received only a debenture in exchange for his stock. The minority shareholder had failed to take advantage of the dissenters' rights provision under pre-BCL law. 370 N.E.2d at 349. After the shareholders approved the merger but before it was effective, the minority shareholder filed suit against the corporation and the officers, directors, and other shareholders. The parties agreed that the only financial injury in the case had been to the corporation itself. *Id.* The defendants moved for summary judgment because the plaintiff was no longer a shareholder and could not pursue a derivative action on behalf of the corporation. In response, the plaintiff added a claim challenging the validity of the merger. The federal district court granted summary judgment, finding that the dissenters' rights provisions provided the plaintiff's exclusive remedy, which he had failed to use. *Id.* at 349–50. The Seventh Circuit certified several questions of state law to the Supreme Court of Indiana. *Id.* at 350–51.

The state court held first that, "in a bona fide merger proceeding, a dissenting or non-voting shareholder is limited to the means provided by statute for the realization of his equity," meaning shareholders would be limited to the remedies of the dissenters' rights chapter. *Id.* at 356. The court added, however, "that a proposed merger which has no valid purpose, which we construe to mean a purpose intended to advance a corporate interest, and which merger would eliminate or reduce a minority shareholders's equity, may be challenged as a *de facto* dissolution, by shareholders entitled to vote upon an issue of dissolution," and that the improper "dissolution" could be enjoined. *Id.*

The Supreme Court of Indiana then turned to the conundrum of providing relief only through a derivative action where the only shareholders with an interest in forcing the corporation to pursue the relevant claims had lost their shares through the merger in question. The court wrote:

> When a merger is justified, its legitimacy has no relevance to the problem of a wrongdoer's avoidance of liability. But, since no wrong should be without a remedy a Court of Equity may grant relief, pro-rata, to a former shareholder, of a merged corporation, whose equity was adversely affected by the fraudulent act of an officer or director and whose means of redress otherwise would be cut off by the merger, if there is no shareholder of the surviving corporation eligible to maintain a derivative action for such wrong and said shareholder had no prior opportunity for redress by derivative action against either the merged or the surviving corporation.

370 N.E.2d at 358.

In *Griffin*, the Court of Appeals acknowledged this suggested "equitable exception" in *Gabhart*, noting that the Supreme Court had supported the proposition with only the broad equitable maxim that no wrong should be without a remedy. 541 N.E.2d at 556. The *Griffin* court found no need to apply the possible *Gabhart* exception because the shareholders in question had an available remedy under the dissenters' rights chapter but had failed to use that remedy.

Defendants interpret *Gabhart* and *Griffin* to suggest that the court in such a derivative action would look at the equities of the situation and provide a remedy to a wronged shareholder. As compared to a direct action for damages under Option 4, defendants' solution requires two unduly complicated steps, a little like a double-bank shot in pool when a straight shot is possible. The first bank is off the special litigation committee, which is required as a screen for true derivative claims, which Shepard's claim is not. The second bank is off the court, as suggested in *Gabhart*, which requires equitable allocation among former shareholders of a recovery won in the name of the corporation in the derivative action. The court is not persuaded that the Supreme Court of Indiana is likely to follow that approach at this time, after enactment of the BCL.

First, the suggested "equitable exception" from *Gabhart* appears not to have been applied by any reported Indiana decision, and the *Gabhart* court did not directly address whether the claims should be treated as derivative or direct actions because the parties had agreed they should be treated as derivative claims. See 370 N.E.2d at 349, 356. The *Gabhart* exception also appears to have been undermined by the later enactment of the BCL. The *Gabhart* exception was addressed to possible fraud in a merger. The official comments on Section 8(c) show that the provision was designed specifically to block such challenges and to remove the very uncertainty *Gabhart* itself had created about

such cases and the "potential disruption" they could cause. The commission wrote: "Hence, the kind of minority shareholder challenge to corporate action permitted by *Gabhart* under IC 23–1–5–7(c) is not permitted under subsection (c)."

In addition, the Supreme Court of Indiana's recent decision in *G & N Aircraft* has addressed in some detail the difference between derivative and direct claims. The state court's opinion suggests the court would not require shareholders affected by a cash-out merger to assert as derivative claims any allegations of wrongdoing in agreeing to a merger at a supposedly low price.

*G & N Aircraft* involved a wide-ranging feud between owners of a closely held corporation. The Supreme Court of Indiana's opinion provides detailed guidance on a host of issues, including the distinction between direct and derivative actions. The court adopted the view that the distinction should be drawn "based on the rights the shareholder asserts." 743 N.E.2d at 235–36. A direct action may be brought when it is based " 'upon a primary or personal right belonging to the plaintiff-stockholder.' " *Id.* (quoting *Schreiber v. Butte Copper & Zinc Co.*, 98 F.Supp. 106, 112 (S.D.N.Y.1951)). The *G & N Aircraft* court explained further: "The rights of the shareholder may be derived from the articles of incorporation and bylaws, state corporate law, or agreements among the shareholders or between the corporation and its shareholders. If none of these establishes a right in the shareholders to the requested relief, the claim, if it exists at all, must be brought on behalf of the corporation in a derivative action." *Id.* (citation omitted).[4]

*G & N Aircraft* applied this approach in a way that indicates Shepard's claims in this case should not be brought as derivative claims. In *G & N Aircraft*, the minority shareholder plaintiff claimed that the majority shareholder had obtained his majority stake by coercing other shareholders to sell their shares for less than fair value. The Supreme Court pointed out that if the defendant had coerced a sale at less than fair value, the coerced shareholders would have had direct claims, not a derivative claim, as shareholders of G & N Aircraft. 743 N.E.2d at 242. Because the method of coercion also inflicted injuries on an affiliated corporation in which the same selling shareholders owned shares, they also would have had a derivative claim on behalf of that injured corporation. *Id.* Similarly, although the minority shareholder plaintiff in the case had not sold his shares at a coercively low price, the Supreme Court said that if he had sold for that unfairly depressed price, "he would still have his claim for damages in the amount of the difference between the fair value of his shares and the price they brought in an extorted sale." *Id.* at 244. Strictly speaking, those statements were *obiter dicta*. They were certainly "considered *dicta*," however, and in the absence of directly controlling authority, they provide a recent and reliable indication of the Supreme Court's views on the questions. See *Hartzler v. Chesapeake & Ohio R. Co.*, 433 F.2d 104, 107 (7th Cir.1970) (federal courts' *Erie* obligation in diversity cases "extends not merely to definitive decisions, but to considered *dicta* as well"). Also, the latter statement was part of the court's explanation of the remedy, and the court clearly contemplated a direct claim, not a derivative claim. See 743 N.E.2d at 245 (recog-

---

4. In adopting this approach, the Supreme Court explicitly rejected an approach advocated by defendants here, which would require a shareholder bringing a direct action to show an injury distinct from any injury suffered by other shareholders and the corporation. *Id.* at 235–36.

nizing direct claims, not derivative claims, as the basis of recovery).

Where the value of shares has been reduced as a result of an injury to the corporation, a claim must be pursued as a derivative claim. Where the alleged wrong is an agreement to a cash-out merger at an inadequate share price, however, the corporation itself is not injured. The shareholders are injured. The corporation itself is not even a party to a sale (forced or not) of the shares in that corporation.

The other problem with defendants' proposal for a derivative action for an injunction to block the merger is that, to remedy financial injuries, it would invite the issuance of injunctions to block mergers approved by a majority of shareholders. Injunctive relief clearly is not available to a shareholder seeking to block the merger of a privately held corporation. That much is clear from *Fleming* and *Galligan* and Section 8(c) itself. The bar to injunctive relief was intended to avoid the disruption caused by such injunctions.

The dissenters' rights chapter substitutes instead a monetary remedy for dissenting shareholders, through the statutory proceeding to determine fair value. Defendants' proposal, relying on a derivative action, would allow injunctions to block mergers of publicly traded corporations. That approach would introduce a sharp and incongruous difference between privately and publicly traded companies. Injunctions would be available to block such transactions affecting (and approved by) many thousands of shareholders in publicly traded corporations, but not transactions affecting only the few shareholders of a privately held company. ·

In addition, the harm claimed by Shepard is purely financial. A monetary remedy is adequate. It seems unlikely that the Indiana courts would transform Section 8(c) into a vehicle that promotes injunctive relief (by encouraging derivative actions) to remedy such purely financial harm.

A remedy that relies on injunctive relief also opens up the prospect of enormous bonds being required to obtain injunctive relief. In this case, for example, the State Auto merger offers a price per share about two and a half times the market price before Shepard announced his first tender offer. If a court erroneously enjoined the State Auto merger, and if the stock price then dropped back to that earlier level, the public shareholders of MIGI might lose more than $50 million in the market value of their shares.

A court issuing an injunction would have to consider that possibility (and others) in deciding the security required for a preliminary injunction. A number of factors may enter into the ultimate determination of an injunction bond. See *Pargas, Inc. v. Empire Gas Corp.*, 423 F.Supp. 199, 244–45 (D.Md.1976) (requiring security of $1 million for preliminary injunction enjoining hostile tender offer), *aff'd mem.*, 546 F.2d 25 (4th Cir.1976). The Seventh Circuit has instructed district courts when setting the amount of security to "err on the high side." *Mead Johnson & Co. v. Abbott Laboratories*, 201 F.3d 883, 888 (7th Cir. 2000) (district court erred in setting injunction bond at $1 million in trademark infringement action; defendant had requested $50 million), *modified on rehearing on other grounds*, 209 F.3d 1032 (7th Cir.2000). The reason is that the amount of the required security is the maximum amount of damages that can be awarded to a party wrongfully enjoined. *Mead Johnson*, 201 F.3d at 888. An injunction in a case like this one, in which an erroneous injunction could depress the stock price of a publicly traded corporation, would probably require security in an amount well into the millions of dollars.

If the Supreme Court of Indiana concludes the type of wrong alleged in this

case requires an effective judicial remedy, it probably would not craft a remedy that both relies on injunctive relief disfavored by Section 8(c) and depends on the willingness of one or a few shareholders to risk devastating financial consequences if they win an injunction that is later set aside. The defendants' proposal for a derivative action seeking injunctive relief shares both features. For these reasons, this court does not view Option 3 as one the Supreme Court of Indiana is likely to adopt.

■ Option 4—a post-merger direct action by an individual shareholder for monetary relief—is this court's choice for the approach the Supreme Court of Indiana is most likely to adopt if confronted with the issue presented here, assuming that the state court concludes that it must craft some remedy for claims arising from a merger that ends a shareholder's ownership of shares.[5]

This option of a post-merger direct action for damages avoids the incongruity of using a derivative shareholder action as a vehicle for asserting claims that are for the benefit of the former shareholder whose shares have been exchanged for cash or shares in another company. This option has the advantage of providing a simpler procedural vehicle for a claim brought by the real party in interest, who would actually benefit from any recovery. It also has the advantage of avoiding the prospect of injunctive relief and its disruptions, which were the primary targets of Section 8(c).

The court has already addressed defendants' argument that such claims for monetary relief must be presented through a shareholder derivative action. Defendants have also argued that a direct action is not an appropriate remedy in this case because directors ordinarily do not owe any legally enforceable duty directly to shareholders of the corporation. Defendants have not cited any direct support for that bold assertion. The recent decisions by the Supreme Court of Indiana in *Galligan* and *G & N Aircraft* undermine that argument.

*Galligan* held that shareholders whose rights under the dissenters' rights statute had been violated by directors' breach of statutory duties under that chapter could bring an action directly against the directors. 741 N.E.2d at 1225–26. Acknowledging the BCL's efforts to limit directors' liability, the court wrote: "We find nothing, however, in that statute that abrogates the basic principle that directors who breach duties to the corporation or to shareholders may be held accountable." *Id.* at 1226. The court also pointed to the assumption that directors may be held liable under the BCL provision setting forth the business judgment rule, which establishes the conditions under which a director "is not liable" for an act or omission. *Id.,* citing Ind.Code § 23–1–35–1. In *G & N Aircraft*, the Supreme Court of Indiana recognized that shareholders could bring direct actions to enforce duties owed to the shareholders, which typically include actions "to enforce the right to vote, to compel dividends, to prevent oppression or fraud against minority shareholders, to inspect corporate books, and to compel shareholder meetings." 743 N.E.2d at 234.

---

**5.** Perhaps another alternative might be to find that the "market exception" in Section 8(b) violates the Indiana Constitution as applied to a cash-out merger for an allegedly inadequate price. That alternative might be based on the court's reliance on Article I, § 12 of the Indiana Constitution in *Fleming,* 676 N.E.2d at 1056. That approach would provide for the judicial appraisal proceeding, but the corporation would have practical difficulty complying with the preliminary notice and procedural requirements of the dissenters' rights chapter based on a prediction that the courts might later find the exception unconstitutional as applied.

The Indiana BCL recognizes that corporate directors may consider many interests beyond those of shareholders. Ind.Code § 23–1–35–1(d). The business judgment rule was written to make clear, for example, that even in the sale of the business, the directors do not have an unqualified duty to maximize shareholder value at the expense of all other considerations and constituencies. The Delaware Supreme Court ruled in 1986 that when a merger or acquisition becomes inevitable, the directors' role "changed from defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders at a sale of the company." *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 182 (Del. 1985). Indiana amended the BCL business judgment statute in 1989 to make clear that it imposes a different standard: "[D]irectors are not required . . . to take or decline to take any other action under this article, solely because of the effect such action might have on a proposed acquisition of control of the corporation or the amounts that might be paid to shareholders under such an acquisition." Ind. Code § 23–1–35–1(f). In an extraordinary passage of statutory language, the legislature continued: "Certain judicial decisions in Delaware and other jurisdictions, which might otherwise be looked to for guidance in interpreting Indiana corporate law, including decisions relating to potential change of control transactions that impose a different or higher degree of scrutiny on actions taken by directors in response to a proposed acquisition of control of the corporation, are inconsistent with the proper application of the business judgment rule under this article." *Id.*

Nevertheless, Indiana directors do owe legally enforceable duties to shareholders. In the context of a cash-out merger, the directors' duties to exercise good faith and ordinary prudence in making decisions about the transaction run directly in favor of shareholders. The corporation itself would not be harmed directly by the sale or exchange of its shares for a low price.

Option 4 thus offers monetary relief to remedy financial harm in the rare cases in which a shareholder can prove a breach of duty under Ind.Code § 23–1–35–1. This approach also adapts the basic goal of the dissenters' rights statute—prevent injunctions but provide a monetary remedy—to the special case posed by a cash-out merger of a publicly traded corporation. Plaintiff acknowledges that such a remedy would offer a meaningful and effective remedy. Hearing Tr. 43. He is not confident Indiana law would actually recognize such a remedy. In fact, the strongest argument against Option 4 is that Section 8(c) was written to foreclose *any* type of challenge to a merger approved by the majority of shareholders in a publicly traded corporation. Nevertheless, although that argument has a good deal of force, the Supreme Court of Indiana has expressed misgivings about the possibility of leaving shareholders without any effective remedy. This court does not purport to be sure that Indiana law would recognize such a monetary remedy in a direct action after the merger closes, but this court's best prediction is that Indiana law would do so.

Ultimately, the Supreme Court of Indiana may need to determine whether and how such a remedy should be available in cases like this, involving a cash-out merger of a publicly traded corporation. This court's best judgment is that the Supreme Court of Indiana is likely to craft a remedy with a direct action against the responsible directors and officers, limited to monetary relief. For purposes of this case, the central point is that injunctive relief certainly is not available. To the extent Shepard has also asserted claims for monetary relief, those claims are not ripe at this time, before consummation of

the merger, so the court has no subject matter jurisdiction over them.

### *Conclusion*

For the reasons explained above, Shepard is not entitled to the relief he seeks in this case. Under Indiana law, he is not entitled to an injunction to block the proposed merger, whether in a direct action or a derivative action. To the extent Shepard might suffer a financial injury in the future if and when the proposed merger is consummated, Indiana law might allow him to seek a financial remedy in a direct action against the responsible directors. At this time, however, such a claim is not yet ripe. Accordingly, the defendants' motion to dismiss this action is hereby granted. The court will enter final judgment dismissing with prejudice plaintiffs' claims for injunctive relief for failure to state a claim upon which such relief can be granted, and dismissing without prejudice plaintiff's claims for monetary relief.

So ordered.